# Use of Polygraph Examinations in Investigating Disclosure of Information About Pending Criminal Investigations

The Attorney General may order Justice Department employees to submit to polygraph tests to answer questions relating to pending criminal investigations, and may discharge an employee for refusing to take such a test.

Even where an employee is entitled to be discharged only "for cause," failure to cooperate with an official investigation by taking a polygraph test may constitute adequate cause, as long as the employee is given reasonable assurances respecting the need for the test and the use to which its results may be put.

February 22, 1980

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

You have asked us to consider the following questions regarding the use of polygraphs in investigating unauthorized disclosures of information about pending criminal investigations: (1) may a Justice Department employee be dismissed for refusing to submit to a polygraph test; and (2) may the results of a polygraph test be used against the employee in (a) administrative proceedings and (b) criminal proceedings? We conclude that the Attorney General may order Department employees to submit to polygraph tests to answer specific questions relating to pending criminal investigations and that employees who refuse to take polygraph tests may be discharged. If any employee is threatened with dismissal for refusing to take a polygraph test, then any evidence obtained through the test may not be used against the employee in a subsequent criminal proceeding. Employees should be warned prior to taking the test that their refusal to participate may lead to their dismissal, but that nothing they say can or will be used against them in a criminal proceeding. It is doubtful that evidence obtained by way of polygraph would, in any event, be admissible in a federal criminal proceeding, unless the employee stipulates to its admissibility.

## I. Polygraphs and Federal Employment

The use of polygraphs for federal employment purposes has been the subject of controversy for a number of years. The discussion focuses on two conflicting trends: the growing scientific acceptance of the reliability of polygraphy and the increasing concern that polygraph examina-

421

tions violate privacy rights and the Fourth, Fifth, and Fourteenth Amendments.

In 1965, the House Committee on Government Operations held hearings and issued a report on the use of polygraphs by the federal government. H. Rep. No. 198, 89th Cong., 1st Sess. (1965). The Committee Report noted that 19 federal agencies used polygraphs; the most frequently reported purpose of the use involved security matters. A total of just under 20,000 tests were administered in 1963. Eight agencies used polygraphs to investigate employee misconduct. (The Department of Justice indicated its use was limited to security and criminal matters.) The Committee strongly criticized the use of polygraphs; it concluded that the accuracy of such tests was unproven and that operators were generally unqualified and undertrained. *Id.* at 1–2.

In 1968, the Civil Service Commission promulgated regulations which prohibit use of polygraphs in employment screening and personnel investigations for members of the competitive service, except for national security purposes. This regulation, which does not apply to the excepted service, is currently in force. Federal Personnel Manual chapter 736, Appendix D.[1]

Senator Ervin introduced a number of bills which would have prohibited the use of polygraphs in the hiring or firing of federal employees and employees of industries affecting interstate commerce. S. 2156, 91st Cong., 2d Sess. (1971); S. 2836, 93d Cong., 1st Sess. (1973), *reprinted in* 119 Cong. Rec. 42681 (1973). *See also* H.R. 2596, 94th Cong., 1st Sess. (1975). None of these measures was enacted.

Additional congressional hearings were held in 1974 before the House Government Operations Committee.[2] A Deputy Assistant Attorney General for the Criminal Division testified that polygraphs had proven useful in a small number of investigations involving a "closed" group of persons—*e.g.,* persons with access to stolen or embezzled property. However, he noted that even in these circumstances, the Criminal Division viewed the results "with caution and opposes their introduction into evidence . . . ." *Hearings* at 414. A representative of the Federal Bureau of Investigation (FBI) testified that "the FBI's official position has always been that [it does] not consider polygraph examinations sufficiently precise to permit absolute judgment of guilt or non-guilt—lie or truth—without qualifications." *Id.* at 418. He added, however, that

> with proper ethics by the polygraph examiner and tight
> administrative control by the user agency, there is no
> question but that the polygraph can be a valuable investi-

---

[1] The regulations require that agencies using polygraphs advise the individual of his or her privilege against self-incrimination and right to counsel. The individual must voluntarily consent to the examination and a refusal to consent may not be included in his or her personnel file.

[2] *The Use of Polygraphs and Similar Devices by Federal Agencies, Hearings Before the House Committee on Government Operations,* 93d Cong., 2d Sess. (1974) ("*Hearings*").

gative aid to supplement interrogation in selected criminal and national security cases. Interrogation is a basic tool of any investigative agency and the FBI considers the polygraph technique a thorough and specialized interview procedure in which a skillful interrogator is attempting to simply ascertain the truthful facts from a consenting individual regarding a matter in which we have jurisdiction.

In some instances suspects will admit deception and furnish confessions and/or signed statements. In most instances valuable new information or investigative direction is developed as a result of the examination and followup interrogation.

*Id.* at 419. The use of polygraphs was strongly criticized by the American Civil Liberties Union on constitutional and scientific grounds. *Id.* at 2–84.

A study prepared in 1974 by the staff of the Subcommittee on Constitutional Rights of the Senate Judiciary Committee reached a conclusion similar to the House Committee in 1965. It stated that

[c]ompulsory submission to a polygraph test is an affront to the integrity of the human personality that is unconscionable in a society which values the retention of individuals' privacy. . . . The Congress should take legislative steps to prevent Federal agencies as well as the private sector from requiring, requesting, or persuading any employee or applicant for employment to take any polygraph tests.

Staff of the Subcomm. on Constitutional Rights of the Senate Comm. on the Judiciary, 93d Cong., 2d Sess., *Privacy, Polygraphs, and Employment,* 17–18 (Comm. Print 1974). The study also concluded, after reviewing the literature on polygraphs, that "doubt must be cast upon the objectivity, accuracy, and reliability of the polygraph test." *Id.* at 9.

Based on the above, it is clear that use of polygraphs for federal employment purposes remains controversial.[3] While civil service regulations prohibit their use for the competitive service, Congress has been made aware that no prohibition exists regarding the excepted service. Several bills that would have prohibited such use have not been enacted.

## II. Attorney General's Authority to Terminate Employment

Analysis of the authority of the Attorney General to dismiss an employee for refusing to submit to a polygraph examination must begin

---

[3] States have taken an active role in limiting use of polygraphs in the employment context. Eighteen states have licensing procedures for polygraph examiners; 15 states prohibit use of polygraphs. *See* Comment, *Privacy: The Polygraph in Employment,* 30 Ark. L. Rev. 35, 37–38 (1976).

with an understanding of the statutory and regulatory protections afforded different classes of Department employees.

Under the civil service laws, Department attorneys and employees of the FBI are in the excepted service. 28 U.S.C. § 536 (FBI); 5 C.F.R. § 213.3102(d) (government attorneys). The Office of Personnel Management (OPM), by regulation, has exempted personnel in the excepted service from the statutory provisions regarding removal of civil servants. *See* 5 C.F.R. § 752.401(c). However, persons in the excepted service who are non-probationary "preference eligibles,"—primarily veterans and the spouses and mothers of disabled and deceased veterans—are afforded the civil service law protections. 5 U.S.C. § 7511(a)(1)(B). *See id.* § 2108 (defining "preference eligible"). The civil service law protections are substantive and procedural. A preference-eligible employee may be removed "only for such cause as will promote the efficiency of the service." Prior to removal, an employee is entitled to 30 days' advance written notice of the reasons for the action, a reasonable time to respond to the charges, the assistance of an attorney, a written decision, and an appeal to the Merit System Protection Board (MSPB). 5 U.S.C. § 7513; DOJ Order 1752.1.

Department employees who are in the excepted service and are not preference-eligibles have no rights arising from a statute or OPM regulation to a statement of reasons for discharge or to an appeal from an adverse action. *See Paige* v. *Harris,* 584 F.2d 178, 181 (7th Cir. 1978). However, the Department is bound by its own substantive standards and procedures even though the employee may have no legitimate expectation of continued employment and could, under relevant statutes, be summarily discharged by the Attorney General at any time. *See Vitarelli* v. *Seaton,* 359 U.S. 535, 539–40 (1959); *Paige* v. *Harris,* 584 F.2d at 184; *Mazaleski* v. *Treusdell,* 562 F.2d 701, 717 n.38 (D.C. Cir. 1977). Department Order 1752.1 (1975), as supplemented by a March 27, 1979 notice, establishes minimal procedures for Department attorneys who are not preference-eligibles. Chapter 6 of the order entitles them only to "a letter of termination prior to the effective date of the termination . . . [which provides] a brief statement of the reasons for the termination."[4]

Substantively, Department attorneys are provided no protections by Department regulations. And since they are not covered by the "for cause" standard of the civil service laws, attorneys apparently serve at the pleasure of the Attorney General. The Attorney General's authority to remove Assistant United States Attorneys (AUSA) is expressly recognized by statute. *See* 28 U.S.C. § 542(b).

This conclusion must be qualified because of recent cases that have held that agency handbooks and informal understandings may establish

---

[4] FBI employees are excluded altogether from DOJ Order 1752.1.

substantive protections for federal employees. In *Ashton* v. *Civiletti,* 613 F.2d 923 (D.C. Cir. 1979), the D.C. Circuit held that "the FBI has fostered rules and understandings which [entitle an FBI employee] to believe that he would lose his job only for a job-related reason." 613 F.2d at 928.[5] The court recognized that FBI employees are in the excepted service and that "[s]tanding alone, the exception could suggest to an employee that he held his job at the sufferance of his employer." It went on to find, however, that the FBI Handbook, Manual of Instructions, and the plaintiff's letter of appointment created an implied promise that the employee would be dismissed "only for failing to perform his duties satisfactorily and without prejudice to the FBI's achievement of its law-enforcement mission." 613 F.2d at 930. In essence, the court held that FBI employees, even though placed in the excepted service by statute, may be discharged only upon a finding of cause similar to that required for dismissal of members of the competitive service.[6] Once it is determined that an employee has a legitimate claim to continued employment—*i.e.,* that he or she may be not be fired at any time—then procedural due process applies: the employee must be afforded a hearing and other procedural safeguards.

We are unaware of any handbooks or guidelines upon which Department attorneys could rely to establish a legitimate claim to continued employment. We cannot, however, rule out the possibility that an attorney could point to a letter of appointment or to informal understandings which a court would deem sufficient to establish a property interest.[7]

In sum, the Attorney General probably has the authority to dismiss a non-veteran Department attorney for any reason, and the attorney is entitled only to a statement of reasons for the discharge. Non-veteran FBI agents probably may be discharged only for job-related reasons, even though they are in the excepted service; they are entitled to a due process hearing. Department employees who are veterans may be discharged only for cause and are entitled to statutory, OPM and DOJ procedural rights.

---

[5] The case concerned the FBI's discharge of an employee because of his admitted homosexuality. The court held that the employee was entitled to a due process hearing prior to termination to determine whether his homosexuality constituted a job-related basis for his dismissal.

[6] *See also Paige* v. *Harris,* 584 F.2d 178 (7th Cir. 1978) (HUD Handbook provides rules and understandings creating legitimate claim to continued employment for employees in the excepted service); *Colm* v. *Vance,* 567 F.2d 1125 (D.C. Cir. 1977) (remanding for consideration of whether the Foreign Service Act requires promotion to be based solely on performance and merit, even though plaintiff could demonstrate no constitutional property entitlement to promotion).

[7] For example, it is conceivable that a court could find that when an AUSA agrees to a 3-year commitment with a U.S. Attorney's Office, that that agreement constitutes a promise by the Department not to discharge the attorney during that period without good cause. A court might also hold that the Department's regulation requiring a statement of reasons for termination implicitly requires the Department to have a "good" reason.

### III. What Constitutes "Cause"

As noted above, the civil service laws authorize removal of covered civil servants "only for such cause as will promote the efficiency of the service." 5 U.S.C. § 7513. The D.C. Circuit has similarly held that an FBI employee may be dismissed "only for failing to perform his duties satisfactorily and without prejudice to the FBI's achievement of its law-enforcement mission." *Ashton* v. *Civiletti, supra.*[8] The question is whether failure to obey an order to submit to a polygraph examination is sufficient cause for discharge under these standards. The following discussion assumes that at the time the employee is ordered to take the test, the employee is assured both that he or she may be discharged for refusing to take the test and that no information obtained in the course of, or as a result of, the examination may be used against him or her in a subsequent criminal proceeding.[9]

At the minimum, failure to obey a legitimate order of a superior constitutes insubordination—an offense punishable by removal. *See* FBI Manual of Instructions, Part I, § 1-20-2 (refusal to cooperate during an interview regarding work-related matters permits discipline for insubordination); § 13, Schedule of Offenses and Penalties for FBI Employees (insubordination punishable by censure to removal). A refusal to submit to a polygraph test also arguably impedes investigation of government misconduct. It thus directly effects the efficiency of the Department by hindering removal of offending employees and restoration of public confidence in the Department. The Schedule of Disciplinary Offenses and Penalties for DOJ Employees, included in DOJ Order 1752.1, identifies the offense of "refusal to cooperate in an official government

---

[8] It is quite clear that the underlying conduct—disclosure of facts of a pending criminal investigation—permits removal of the offending employees. The conduct may violate various criminal statutes and plainly violates a number of OPM and DOJ standards of conduct. *See, e.g.,* 5 C.F.R. §§ 735.201a(c) (impeding government efficiency); (e) (making a government decision outside official channels); (f) (affecting adversely the confidence of the public in the integrity of the government); 735.206 (misuse of information not made available to the general public); 735.209 (conduct prejudicial to the government); 28 C.F.R. §§ 45.735-2(c)(3) (impeding government efficiency); (c)(6) (affecting adversely the confidence of the public in the integrity of the government); 45.735-10 (improper use of official information); 45.735-18 (1980) (conduct prejudicial to the government).

It is possible that an employee charged with unauthorized disclosure may assert a First Amendment defense: that the government may not constitutionally prohibit him or her from commenting on matters of public importance. While the employee may have an interest in commenting upon matters of public interest, this interest must be balanced against the government's interest in promoting the efficiency of the public services it performs through its employees. *See Pickering* v. *Board of Education,* 391 U.S. 563 (1968). The D.C. Circuit has identified the relevant factors in the "balancing test" as: the sensitivity and confidential nature of the employee's position and the government's consequently legitimate need for secrecy; the subject matter of the speech; the truth or falsity of the speech; the interference with job performance; the context of the speech; the effect of the speech on agency morale and working relationships with immediate superiors. *Hanson* v. *Hoffman,* 628 F.2d 42, 50 (D.C. Cir. 1980). It would appear that the government's interest in preventing disclosure is at its maximum in regard to information relating to pending criminal investigations.

[9] Without these assurances, an employee could not constitutionally be fired for refusing to take the polygraph test. *See Kalkines* v. *United States,* 473 F.2d 1391 (Ct. Cl. 1973); *see also Sanitation Men* v. *Sanitation Commissioner,* 392 U.S. 280 (1968).

inquiry" and lists the suggested discipline as "official reprimand to removal."

The obligation of public officials to answer questions related to the performance of their public duties is well-recognized. The Supreme Court has upheld the right of public employers to fire employees solely for their refusal to sign affidavits or answer questions related to their fitness to perform their public functions. *See, e.g., Lefkowitz* v. *Turley,* 414 U.S. 70, 84 (1973); *Sanitation Men* v. *Commissioner,* 392 U.S. at 285; *Beilan* v. *Board of Education,* 357 U.S. 399 (1958). These holdings are based on the recognized public interest in the accountability of public servants. This interest appears at its zenith when the integrity of law-enforcement activities is at stake. As stated by Justice Harlan,

> [I]t is surely plain that [a State] may . . . require its employees to assist in the prevention and detection of unlawful activities by officers of the state government. The urgency of these requirements is the more obvious . . . where the conduct in question is that of officials directly entrusted with the administration of justice. The importance for our systems of justice of the integrity of local police forces can scarcely be exaggerated.

*Garrity* v. *New Jersey,* 385 U.S. 493, 507–08 (1967) (Harlan, J., dissenting).[10]

Thus, if the use of polygraphs is deemed a necessary part of an investigation of leaks, then a refusal to submit to such a test could impede the investigation and consequently hinder the efficiency of the Department. Department standards of conduct recognize the affirmative duty of employees to cooperate with official investigations, and refusals to cooperate are deemed serious enough offenses to warrant removal in appropriate cases. We can see no meaningful difference between compelling an employee to answer questions or sign an affidavit and compelling an employee to submit to a polygraph test.[11] While the results of the test may be open to question and debate, the refusal to take the test may properly be characterized as conduct which does not promote the efficiency of the Department. Accordingly, we believe that an employee could be dismissed for refusing to take a polygraph examination.[12]

---

[10] Although the Court held in *Garrity* that the incriminating statements of a public official obtained under threat of dismissal could not be used in a criminal proceeding, the majority did not disagree with Justice Harlan's statement regarding the public interest that public officers provide information about the conduct of their activities. *See also Gardner* v. *Broderick,* 392 U.S. 273, 278 (1968).

[11] We reach this conclusion even though we recognize that the use of a polygraph is a greater intrusion into an individual's privacy to the extent it probes unrelated matter, private thoughts, and beliefs.

[12] One district court has upheld the authority of a city transit authority to fire employees suspected of intoxication who refuse to submit to urinalysis or blood tests. The court relied upon the *Garrity* line of cases for the proposition that public employees may be discharged for refusal to properly account for the performance of their duties. *Division 241, Amalgamated Transit Union* v. *Suscy,* 405 F. Supp. 750 (N.D. Ill. 1975), *aff'd, per curiam,* 538 F.2d 1264 (7th Cir.), *cert. denied,* 429 U.S. 1029 (1976).

An arguable objection to this conclusion may be phrased as follows. Polygraph tests have not achieved recognized acceptance among the courts and the experts as accurate indicators of truth-telling. For example, the test may show deception where a truthful subject is nervous, tense, over-tired, or angry, or when an examiner asks misleading or inadequate questions. *See United States* v. *Alexander,* 526 F.2d 161, 165 (8th Cir. 1975). Thus, where an employee believes that the results of the polygraph will not be accurate, refusal to take the examination should not be grounds for removal.

We believe that if the investigator can establish a reasonable basis for the use of the polygraph in the course of the investigation, then a refusal by an employee to take the test would be impermissible, notwithstanding the subjective fear of the employee. A reasonable basis would be established by showing the need for use of the technology and the state of the art. We believe that adequate scientific evidence exists which would support an investigator's decision that polygraphy could be helpful in the pursuit of the investigation. *See, e.g., United States* v. *De Betham,* 470 F.2d 1367 (9th Cir. 1972) *(per curiam), cert. denied,* 412 U.S. 907 (1973) (although holding that district court did not abuse discretion in excluding polygraph evidence, court noted that evidence "vigorously support[ed] the accuracy of polygraphic evidence"); *United States* v. *Oliver,* 525 F.2d 731, 737 (8th Cir. 1975), *cert. denied,* 424 U.S. 973 (1976) (upholding admission of polygraph evidence where parties stipulated admissibility; court could not conclude that polygraph "is so unreliable as to be inadmissible in this particular case"); Tarlow, *Admissibility of Polygraph Evidence in 1975: An Aid in Determining Credibility In a Perjury-Plagued System,* 26 Hastings L.J. 917 (1975).[13] We recognize, however, that reliability of polygraphy remains hotly contested, and courts of appeal have permitted introduction of polygraph evidence only when the parties have stipulated to its admissibility. *See United States* v. *Alexander, supra* (summarizing cases and denying trend of admitting polygraph evidence); *Hearings, supra.*[14]

The reasonableness of the use of a polygraph would be supported by a record establishing the reason for its use, the expected accuracy of the technology, the qualifications of the examiner, and the reliance upon other evidence to establish and corroborate the results of the investigation.[15] Once the reasonable basis for the use of polygraphy is established, we do not believe than an employee can, with impunity,

---

[13] One factor frequently cited by courts for excluding polygraph evidence is the probability that the jury will accord it undue weight. Of course, this concern is not present when administrative proceedings are contemplated.

[14] The D.C. Circuit continues to adhere to its *per se* rule against admissibility as established by the leading case of *Frye* v. *United States,* 293 F. 1013 (D.C. Cir. 1923). *See United States* v. *Skeens,* 494 F.2d 1050 (D.C. Cir. 1974).

[15] Presumably, the quality of the examination and the qualifications of the examiner would be quite high if the examination is conducted by FBI polygraph experts.

refuse to take the examination any more than he or she could refuse to submit to fingerprinting or blood-typing.

## IV. Use of the Results of a Polygraph Test

As long as the employee is promised that any evidence obtained in the course of the polygraph test will not be used in a subsequent criminal proceeding, the Fifth Amendment does not bar its use in an administrative proceeding.[16] Of course, such a promise, and the Fifth Amendment, prohibit use in any criminal proceeding. *Garrity* v. *New Jersey, supra.*

## V. Conclusion

We conclude that the Attorney General may discharge an employee for refusing to take a polygraph examination where the examination is necessary to an official investigation of unauthorized disclosures about pending criminal investigations, provided that the employee has been warned that failure to submit to the test could lead to his or her dismissal and that nothing obtained in the examination will be used against the employee in a subsequent criminal proceeding. Even if a court were to hold that Department attorneys may only be discharged "for cause," we conclude that, generally, failure to cooperate with an official investigation is adequate cause, although each situation must be evaluated on a careful case-by-case basis.

Larry A. Hammond
*Acting Assistant Attorney General*
*Office of Legal Counsel*

---

[16] Because of the controversy surrounding the use of polygraphs, it is possible than an employee discharged solely on the basis of polygraphic evidence would challenge the dismissal as arbitary and irrational agency action. We do not believe that, absent a judicially recognizable property or liberty interest, an employee may challenge agency action as a violation of due process unless the agency has not followed its own regulations. *See Paige* v. *Harris,* 584 F.2d at 184; *cf. Bishop* v. *Wood,* 426 U.S. 341 (1976). At least one court, however, has held that a government decision is subject to challenge as arbitrary and capricious even where the employee has no property right in continued employment. *Heaphy* v. *U.S. Treasury Dept.,* 354 F. Supp. 396 (S.D.N.Y. 1973) (Tyler, J.), *aff'd on opinion below,* 489 F.2d 735 (2d Cir. 1974). If a court were to permit a challenge to a dismissal based solely on the results of a polygraph examination, the non-arbitrariness of the action would depend upon such factors as the quality of the examination, the skill and training of the examiner, and the inherent credibility of the employee's statements.