Donald R. ASHTON, Jr., Appellant,

v.

Benjamin R. CIVILETTI, Attorney General of the United States of America, Department of Justice, et al.

No. 76–1142.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 21, 1979.

Decided Oct. 4, 1979.

Rehearing Denied Jan. 4, 1980.

Steven S. Rosenthal, Washington, D. C., with whom Charles Lister and Ralph J. Temple, Washington, D. C., were on the brief, for appellant.

Constantine J. Gekas, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Sil-

bert, U. S. Atty., John A. Terry and Peter E. George, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellees.

Before WRIGHT, Chief Judge, and McGOWAN and LEVENTHAL, Circuit Judges.

Opinion for the court by Circuit Judge McGOWAN.

McGOWAN, Circuit Judge:

Appellant Donald Ashton, a non-investigatory employee of the Federal Bureau of Investigation, complained in the District Court of the abrupt termination of his employment solely by reason of his admission of homosexuality. Appellees—the Attorney General of the United States and the Director of the Bureau—moved for summary judgment on the grounds that appellant (1) had voluntarily resigned and (2) had no expectation of continued employment entitling him to a due process hearing prior to his discharge. Pretermitting the first of these questions, the District Court based the judgment appealed from on the second. Because we conclude that the FBI's communications to appellant gave him a property interest in his job which entitled him to the protections of procedural due process, we reverse the grant of summary judgment and remand for further proceedings consistent herewith.

## I

The facts giving rise to this controversy are derived mainly from affidavits submitted respectively in support of, and in opposition to, the motion for summary judgment. Appellant's employment by the FBI began on October 3, 1973, when, recently graduated from high school, he began work as a mail sorter in the Messenger Unit of the Files and Communications Division. He continued in that employment until January 10, 1975, during which period his grade classification was increased from GS–2 to GS–4 and no dissatisfaction with his work was registered by his supervisors. His appointment was formally embodied in a letter to him from Director Kelley, dated September 5, 1973, which in principal part was as follows:

Dear Mr. Ashton:

I am pleased to offer you an appointment in the Federal Bureau of Investigation, United States Department of Justice, as a Clerk in Grade GS 2 with salary at the rate of $5432 per annum less necessary deductions. This appointment is probationary for a period of one year during which time you will be required to demonstrate your fitness for continued employment and is subject to cancellation or postponement at any time prior to your entry on duty. In accepting this appointment you will be expected to remain on duty for a minimum period of one year contingent, of course, upon your maintaining a satisfactory work record. This is necessary in view of the substantial expense involved in the overall processing of your application and the training which will be afforded you following your entry on duty. Your assignment will depend upon your qualifications and the needs of the Bureau at the time of your entry on duty. Positions in the Federal Bureau of Investigation are excepted by law from the competitive Civil Service, and your acceptance of this appointment will automatically constitute relinquishment during your tenure of any such competitive status you may have acquired. J.A. 148.

The only reference in this letter to conduct was that "Employees are expected to dress appropriately for work in a business office."[1]

At 10:30 A.M. on January 10, 1975, appellant, without prior notice of any kind as to the purpose of the meeting, was summoned to the office of Special Agent Paul F. Shea. With Mr. Shea was Special Agent Richard E. White, who was serving at that time as Chief of the Mail Processing Unit in which

---

1. Attached to the letter was a form check list entitled "Additional Instructions To Appointee." One item checked as applicable to appel- lant was a statement that "[T]his is a temporary indefinite appointment and deductions will be taken from your salary for Social Security."

appellant worked. Shea directed appellant's attention to a Naval Investigation Service Report which had been transmitted to the FBI and which said that a person ("subject") under Navy investigation had admitted engaging in homosexual activities with several people, one of whom he could identify only as Don, a mail clerk with the FBI.

Shea asked appellant if he knew the subject and, after some uncertainty about the name, appellant recalled that he had met him some months earlier at a restaurant in Washington and had gone with him to his apartment in Quantico, Virginia. In response to Shea's specific questions, appellant denied engaging in oral intercourse but said that he and the subject had fondled each other; and he went on readily to admit his homosexuality since his junior year in high school three years earlier.[2] In answer to Shea's question as to whether any of appellant's fellow FBI employees knew of his homosexuality, appellant, according to Shea, said that, by reason of his discreet reserve on this score, none did, including his roommate who was an FBI employee.

Shea then interrupted the interview for the purpose of going to consult with Special Agent Woodworth in the Administrative Division, who was familiar with the Naval Intelligence report. After hearing from Shea of appellant's admissions, Woodworth advised Shea that appellant should be told that he could voluntarily resign, but, if he did not, Shea would be obliged "to recommend appropriate disciplinary action which could include censure, censure and probation, or termination of his employment."

According to appellant, when Shea returned he told him that "Woodworth had advised him that I should be dismissed if I

didn't resign immediately." Appellant's affidavit describes the remainder of the interview as follows:

7. I repeatedly asked if I might be placed on probation or censured. They said that it was unlikely. I asked if I could at least finish the pay period, which would mean I would work another week. Mr. Shea said no, that I had to resign immediately.

8. I was told that if I did not resign immediately everyone would know of my homosexuality. Whether everyone knew of my homosexuality made no difference to me. I was also told that I would have difficulty in finding employment and it would prove a great embarrassment to me, but that if I did resign I could use them as a reference and nothing would be said to my prospective employer. Two weeks after I left I called Mr. Shea and he said he knew nothing of how references worked; I called because I felt they had been giving bad references after I was insured [sic] that if and only if I resigned I would be assured a good reference.

9. I did in no way want to resign. At the time of the interview I was frightened and confused. From beginning to end I was never offered or advised of my right to legal counsel or of my right to remain silent, and I answered all the questions put to me. I had no time to reflect on or analyze the situation I was in, and I submitted a resignation only because I was offered no possible alternative.

The affidavits of Shea and White offer a somewhat different account of this later portion of the meeting.[3] All parties agree,

---

2. When Shea asked if appellant was interested in receiving psychiatric help, appellant replied that he was not. Appellant went on to explain this answer by saying that "I accepted my status and trusted the conclusions of the American Psychiatric Association that homosexuality is not a mental disorder." J.A. 170.

3. Shea and White confirmed that, upon the former's return from seeing Woodworth, he informed appellant of his right to resign. Shea asserts that he told appellant that he had dis-

cussed the matter with the Administrative Division, and that appellant inquired as to what would happen if he did not resign. Both Shea and White assert that Shea said that he was to prepare a recommendation of disciplinary action which could be either censure, censure and probation, or dismissal. Shea explained that his recommendation would not be final inasmuch as it required approval by the head of the Files and Communications Division and further

however, that at 12:00 noon appellant executed a hand-written resignation effective immediately. On January 24, 1975, appellant, through the medium of newly retained counsel, represented to Director Kelley that his resignation was involuntary and requested reinstatement. By letter of February 5, 1975, Director Kelley advised counsel that the FBI had "not found a basis for reinstatement as requested."

On May 9, 1975, appellant's complaint was filed in the District Court. It asserted, *inter alia,* that (1) appellant's resignation had been coerced, (2) his rights of property and liberty had been denied without the hearing required by the Due Process Clause, and (3) his First and Fifth Amendment rights had been violated by the termination of his job for a reason bearing no rational relationship to the performance of his assigned duties. Addressing only the second of the two issues relied upon by appellees in their motion for summary judgment, the District Court ruled that the Fifth Amendment afforded appellant no procedural safeguards. This was so, said the court, because appellant was "unable to demonstrate any property interest in his position." [4]

## II

Although the disposition made by the District Court on summary judgment involves only appellant's right *vel non* to a due process hearing before dismissal, latent in the case is the substantive issue of whether appellant's homosexuality, without further inquiry of any kind and particularly with respect to job-relatedness, either required or justified termination of his employment. In the course of oral argument

on appeal, a statement to this effect by counsel for appellees prompted this court to request that counsel check with his clients and submit a more formal representation as to precisely what the FBI's policy presently is in this regard. The supplemental memorandum filed March 2, 1979, in response to this request contained the following statement:

> The Federal Bureau of Investigation has always had an absolute policy of dismissing proven or admitted homosexuals from its employ.

In this court appellant challenges the District Court's holding that he was without procedural rights of any kind. He goes on to point out, however, that his complaint went beyond procedure to substance in that it charged appellees with unlawfully dismissing a non-probationary, non-investigatory employee solely by reference to homosexuality and with no demonstration of the relevance of that condition to job performance. Three foundations are asserted for this proposition:

1. Appellant's discharge was agency action of an arbitrary and capricious nature within the contemplation of the Administrative Procedure Act.

2. Appellant enjoys substantive constitutional protections against dismissal under the circumstances here involved.

3. The FBI's regulations, properly construed, do not extend to appellant's dismissal.

These issues have not as yet been addressed by the District Court; accordingly,

transmittal to the Administrative Division for an additional recommendation and final action. He did tell appellant that he personally would recommend dismissal, and he suggested to appellant that a resignation by the latter would look better on his record.

**4.** The District Court explained that appellant had a "negative expectation" of job security, since he "was made fully aware of the absence of Civil Service protections in the letter confirming his appointment." Mem.Op. at 2. Further, the passages from the *Handbook* discussed in the text *infra* "placed [appellant] on

notice that his tenure with the Bureau was contingent on his conduct at home as well as in the office." *Id.* at 3. Finally, the District Court suggested that appellant failed to show a "pervasive de facto [tenure] system" comparable to the one in *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). "If anything," the District Court concluded, "the practical realities of job security at the Bureau are the opposite of the conditions analyzed by the Court in *Sindermann.*" *Id.* at 4. The District Court did not further identify those "practical realities."

we do not pursue them at this time. We note, however, that although it has been represented to us by counsel post-argument that the FBI "has always had" an absolute and unconditional policy of terminating any and all homosexuals in its employ once that status is established, there are matters in the record before us and in a recent public statement of the current Director of the FBI[5] that do not entirely square with such a policy. Special Agent Shea's affidavit asserts that, when he reported appellant's admission of homosexuality to Mr. Woodworth, the latter advised that the recommendation of discipline could be either censure, censure and probation, or termination. Further, there is nothing in the FBI's rules or regulations, as evidenced in this record, that in specific terms denominates homosexuality without more as a cause for automatic dismissal.

We also note that, if indeed such an absolute and uncompromising policy does continue to exist, it stands in sharp contrast to that applicable to the great bulk of employees in the federal service. Following judicial decisions from *Norton v. Macy*, 135 U.S.App.D.C. 214, 417 F.2d 1161 (D.C.Cir. 1969), to *Society for Individual Rights, Inc. v. Hampton*, 63 F.R.D. 399 (N.D.Calif.1973), the Civil Service Commission instructed supervisors and others responsible for suitability evaluation:

> [Y]ou may not find a person unsuitable for Federal employment merely because that person is a homosexual or has engaged in homosexual acts, nor may such exclusion be based on a conclusion that a homosexual person might bring the public service into public contempt. You, are, however, permitted to dismiss a person or find him or her unsuitable for Federal employment where the evidence establishes that such person's homosexual conduct affects job fitness—excluding from such consideration, however, unsubstantiated conclusions concerning possible embarrassment to the Federal Service.[6]

5. William H. Webster on "Face the Nation," July 22, 1979, Transcript at 11–13:

   MARRO: I'd like to ask a question about personnel practices at the FBI. You had a—a couple of cases in recent weeks where there were—I think two, maybe just one—file clerks who were dismissed from the bureau because they were homosexuals.

   MR. WEBSTER: One.

   MARRO: One, okay. Is there any real—is there any real challenge to the national security, or the integrity of FBI operations, by having homosexual file clerks pushing mail carts through the J. Edgar Hoover building?

   MR. WEBSTER: Let's—let me try to answer that question without directing it to the particular case that's involved, because that's going through the administrative process, and I have not received the formal appeal.

   All of our employees at FBI headquarters have top secret clearance, and therefore presumably have access anywhere in the building, although we have internal restrictions that would protect the most sensitive material from any employee who just happened to come along.

   Law enforcement generally has been troubled by this problem. Traditions in law enforcement—and I've checked around all the different federal agencies and I know the posture in state and local law enforcement—has been that there is a potential for compromise for those who engage in such conduct which is generally not approved by society, and in some places, illegal.

   Now, we treat it as a factor, and I must say in candor, it's a significant factor. It's a troublesome thing; I hope that the particular case will be handled with fairness and justice and I hope that at some point we will have a better understanding of the problem and the policy that should be addressed to it.

   GRAHAM: In a related way, Sir, in the old days, J. Edgar Hoover days, they used to transfer to Dubuque an agent who spent the night with a person of the opposite sex not his spouse. Is that still the rule?

   MR. WEBSTER: No, that's not the rule. We're trying to stay out of people's private lives unless their conduct, and the emphasis is always on conduct not on personal beliefs, impacts upon the effectiveness of that individual and the Bureau and the area in which—

   GRAHAM: So an agent can live with a person of the opposite sex?

   MR. WEBSTER: Well, I don't have a policy for or against that conduct but how the Bureau is seen is important in our effectiveness.

6. Civil Service Bulletin, Dec. 21, 1973. Since they are not excepted from the Civil Service regime, this policy must be followed by such federal police agencies as the Secret Service, the Bureau of Narcotics and Dangerous Drugs, and the Bureau of Customs.

The Navy and Air Force have similarly altered their policies,[7] as two recent decisions of this court indicate. In *Matlovich v. Secretary*, 192 U.S.App.D.C. 243, 591 F.2d 852 (1978), an Air Force regulation embodying a general policy of termination for homosexual acts contained a qualifying provision to the effect that exceptions could be made if "the most unusual circumstances exist and provided that the airman's ability to perform military service has not been compromised." In *Berg v. Claytor*, 192 U.S. App.D.C. 240, 591 F.2d 849 (1978) it appeared that, although a Navy regulation in terms made no exceptions to a general policy of separating homosexuals from the service, the Secretary of the Navy was not in fact treating it as absolute and had instructed the disciplinary board in question that it had discretion to recommend retention.[8] Since in neither case had the agency articulated adequately its reasons for dismissing each appellant, particularly in the light of the qualifying exceptions, we remanded the cases for reexamination by the agencies and found it premature to deal with the constitutional claims.

### III

It is common learning that a government employee who has a property interest in his job may not be deprived of it without due process of law. *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). As the Supreme Court wrote in *Board of Regents v. Roth*, "It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined." 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). In deciding whether an employee has such a property interest, courts look to the "rules or understandings" that define the terms of his employment. *Perry, supra* at 601, 92 S.Ct. 2694.

Appellees remind us that positions in the FBI are excepted from the competitive civil service, 28 U.S.C. § 536, and that FBI employees therefore do not have the procedural rights, 5 U.S.C. § 7501(b), guaranteed members of the competitive civil service. Appellees' Brief at 15–18. But those facts do not prevent the Bureau from giving its employees some security in their jobs. We are convinced that the FBI has fostered rules and understandings which, by entitling appellant to believe that he would lose his job only for a job-related reason, gave him a property interest in his position such that he could be fired only under the procedural protections of the Due Process Clause.[9]

---

7. The Army's general policy is that "homosexuality is incompatible with military service." However, "[m]embers who have been involved in homosexual acts in an apparently isolated episode, stemming solely from immaturity, curiosity or intoxication normally will not be processed for discharge because of homosexual acts." AR 635–200, § V, ¶ 14–33(a)(3).

8. The Navy's regulations were recently revised and now state:

   Any member who solicits, attempts, or engages in homosexual acts shall normally be separated from the Naval service. The presence of such a member in a military environment seriously impairs combat readiness, efficiency, security and morale.

   SECNAVINST 1900.9C, ¶ 4 (January 20, 1978). However, they also provide:

   A member who has solicited, attempted, or engaged in a homosexual act on a single occasion and who does not profess or demonstrate proclivity to repeat such an act may be considered for retention in the light of all relevant circumstances. Retention is to be permitted only if the aforesaid conduct is not likely to present any adverse impact either upon the member's continued performance of military duties or upon the readiness, efficiency, or morale of the unit to which the member is assigned either at the time of the conduct or at the time of processing . . . .

   *Id.* ¶ 6(b).

9. Whether FBI employees have a property interest in their positions is the question we left open in *Wehner v. Levi*, 562 F.2d 1276 (D.C.Cir. 1977). Plaintiff in *Wehner*—an FBI clerk—had gone with a co-worker

   to a nearby restaurant for a beer. Upon their return, after being confronted by their supervisor, they admitted leaving the building without permission and consuming alcoholic beverages during working hours [and against FBI regulations].

   562 F.2d at 1278. Plaintiff was warned his job was in jeopardy, was allowed to submit a written explanation of the episode, and talked with the Assistant Director of his Division.

The FBI primarily informed appellant of the terms of his employment in his letter of appointment and in a *Handbook* for non-investigative FBI employees which he was given when he began to work. In these, appellant was told he had a "temporary indefinite" appointment. It is difficult to know what appellant was supposed to understand by this ambiguous expression. But the FBI *Handbook's* explanation of it is plain:

> If you have a "temporary indefinite" appointment, this does not mean that your position has any limited duration. You may assume that your position is secure, if you continue to do satisfactory work. [J.A. 27.]

The Bureau could hardly have conveyed more precisely the understanding that appellant did not hold his position at the whim of his superiors and that he would lose his position only for behavior which impaired his efficiency or that of the Bureau.[10]

That understanding was confirmed by another fact: appellant's position was explicitly made probationary for one year. In the absence of any special definition of that word, appellant could only be expected to comprehend it in its normal meaning—that he was required to serve an initial proving period in which his performance could be tested and, if his employer was dissatisfied, in which he could be fired without ceremony. A probationary period, of course, would be unnecessary if the employer could

dismiss a non-probationary employee at any time and for any reason.

Appellees direct our attention to the employee's *Handbook*, particularly its *Personal Conduct* subsection, and ask us to infer from it that "an employee can be dismissed for any number of reasons unrelated to his employment with the Bureau." Appellees' Brief at 23. It is true that the Bureau seems preoccupied with what might well be thought the private lives of its employees.[11] But at most the *Handbook* only hints that employees may be fired for causes unrelated to their job performance. More important, the *Handbook* regularly introduces and explains its rules in terms of their relationship to the work of the Bureau. For instance, the prefatory part of the *Responsibilities, Obligations, Rights & Privileges as an FBI Employee* section speaks of "'musts' we know are inseparable from our jobs as law enforcement personnel." J.A. 43.

Further, reasonably interpreted, all of the rules may be seen as attempts to regulate job-related behavior and thus as giving employees no notice that they may be fired at will, without warning, for any or no reason. Appellees would have us read two of the rules as exceptions to this generalization. The first is *Misconduct or Neglect of Duty*, J.A. 52, which appellees mark as "of particular relevance to the claims of appellant." Appellees' Brief at 5. That subsection's prohibitory sentence reads:

---

Following a review of the facts and plaintiff's explanation, both the Files and Communication Division and the Administrative Division recommended to the FBI Director that plaintiff's resignation be requested. This recommendation was approved by the Director. Plaintiff was requested to resign, several times, but refused. He was then discharged. *Id.* (footnote omitted).

The court found it unnecessary to determine whether plaintiff had a property interest in his job, since

> on the facts of this case . . . the opportunities provided to appellant to explain his conduct—both in writing and during the meeting with the Assistant Director of the Files and Communications Division—satisfy the requirements of due process.

*Id.* at 1278–79.

10. The District Court reasoned that appellant "knew that his position would not disappear in a given period of time, but also knew that he did not have a 'permanent' position." Mem.Op. at 4. But especially since "temporary" positions were created "in order to prevent increases in the number of permanent personnel," Pub.L. 843, Sept. 27, 1950, "temporary indefinite" would seem simply to mean that "temporary" positions might more commonly be sacrificed in a reduction in force. That interpretation robs "temporary" of whatever relationship it has to firing employees for causes unrelated to their work.

11. *See, e. g.,* the *Handbook's* subsections *Grooming and Demeanor; Outside Employment or Business Ventures; Payment of Debts;* and *Marriages, Divorces, Annulments, Births, and Name Changes.*

No employee shall engage in criminal, infamous, dishonest, immoral, or notoriously disgraceful conduct, neglect of duty, or *other conduct prejudicial to the Government.* [Emphasis added.]

The vagueness of its language may make the subsection's scope broad, but the final phrase intimates that the FBI bans such conduct for reasons relating to the successful conduct of its affairs.[12]

Second, appellees invoke a subsection labelled *Personal Conduct*, which, uniquely, warns that its provisions are "a condition of employment." J.A. 52. It too is broadly worded, even to the extent of stating that "conduct must not only be proper but must always appear proper." The subsection begins, however, with a limiting phrase: "In order to effectively discharge the heavy responsibilities placed on the FBI . . . ." And the express purpose of the appearance-of-virtue requirement is to prevent employees from becoming "engage[d] in any activity or . . . involved in any situation which could be misinterpreted or misunderstood *to the detriment of the service.*" J.A. 52 (emphasis added).

Appellees and the court below emphasize that the FBI is excepted from the Civil Service regulations relating to selection and tenure. 28 U.S.C. § 536. Standing alone, the exception could suggest to an employee that he held his job at the sufferance of his employer. However, the Bureau did not convey that suggestion to appellant.[13] On the contrary, when the Bureau acquainted its employees with the exception, what it told them was: "[Y]ou give up, during your service here, any competitive status which you may have acquired previously." J.A. 27 (*Handbook*). *See also* J.A. 113 (Manual of Instructions); J.A. 148 (letter of appointment). The Bureau gave no indication that it believed that appellant also forfeited any claim to protection against arbitrary dismissal.

In sum, appellees made to appellant "a clearly implied promise of continued employment," *Board of Regents v. Roth, supra,* 408 U.S. at 577, 72 S.Ct. at 2709, a promise which endowed appellant with a property interest in his employment and which thus assured him the protection of due process of law. Since the dimensions of a property interest are defined by the rules and understandings which gave rise to it, *id.,* and since appellees' promise was by its terms contingent only on "satisfactory work," J.A. 27 (*Handbook*), appellant could properly be dismissed only for failing to perform his duties satisfactorily and without prejudice to the FBI's achievement of its law-enforcement mission.[14] The District Court thus erred in finding that appellant was not entitled to procedural due process.

---

12. That appellant would have been justified in reading this section in the manner we suggest is confirmed by the Civil Service Commission's reading of an almost identical provision of its regulations. That provision—"General Conduct Prejudicial to the Government"—reads:

An employee shall not engage in criminal, infamous, dishonest, immoral, or notoriously disgraceful conduct, or other conduct prejudicial to the Government.

5 C.F.R. § 735.209. This must be interpreted as compatible with 5 U.S.C. § 7501(a): "An individual in the competitive service may be removed or suspended without pay only for such cause as will promote the efficiency of the service." And, as we noted *supra,* the Commission restricts firings for homosexual conduct to those instances in which homosexuality affects job fitness. Text at note 5.

13. Similarly, when Director Hoover testified before Congress in 1940 in favor of excepting positions in the FBI from the competitive civil service, his stress was on the FBI's problems with unsuitable candidates certified to the Bureau by the Civil Service Commission. His testimony may fairly be summarized as follows. Of 5,109 names certified to the FBI to fill technical fingerprint positions, only 363 were acceptable. Investigating 5,109 names would cost at least half a million dollars and inordinate time from an agency whose time is of the essence. The FBI's work has suffered because of this situation. Nor can the FBI simply accept those certified to it, since many of them are seriously unqualified. Defendants' [now Appellees'] Memorandum of Points and Authorities in Support of Motion for Summary Judgment at 5–6.

14. This court discussed how an employee's homosexual conduct might be thought to affect his efficiency or that of his employer in *Norton v. Macy,* 135 U.S.App.D.C. 214, 417 F.2d 1161 (1969).

As to the question of appellant's due process rights we discern no disputed issues of material fact, and we have based our decision upon the uncontroverted portions of the record. The FBI has had every opportunity and incentive to present any further evidence on the issue of appellant's due process rights and has in any case provided in response to appellant's discovery request, "[a]ll rules, regulations, policy statements, or other written memoranda which set forth, discuss, or otherwise refer to" hiring, disciplining, and dismissing its employees. J.A. 10–12. The record thus appears to be complete with respect to the representations made by the FBI to appellant as to the conditions of his employment, and it is by reference to those representations that we find appellant's entitlement to the procedural protections of the due process clause.

We therefore find the District Court's grant of summary judgment to be unwarranted, not because it was inappropriate by reason of the existence of disputed questions of material fact, but rather because, from the uncontroverted facts appearing in the record, the legal conclusion it drew from them was erroneous. Those facts supported a legitimate expectation by appellant that his employment would not be terminated for a reason unrelated to job performance, and that any termination purporting to rest upon such a relationship would be preceded by a due process hearing.

Of course, we cannot now decide whether appellant voluntarily resigned. That question was expressly not addressed by the District Court, and appellees now "agree that the character of appellant's resignation is a disputed issue of material fact in view of the conflicts between the affidavits filed in connection with the motion for summary judgment." Appellees' Brief at 9 n.5. Neither do we now decide, if it be found that appellant did not voluntarily resign, whether his homosexuality or behavior related to it could constitute a job-related basis for dismissal justifying his discharge. That would be an issue to be explored in a due process hearing of the kind of which, on the record before us (and assuming he did not voluntarily resign), appellant was wrongfully deprived when his employment was terminated in 1975. Finally, we are deciding nothing with respect to the hearing rights of Bureau employees other than appellant.

The grant of summary judgment by the District Court is reversed, and the case remanded for further proceedings consistent herewith.

*It is so ordered.*