**Harry G. MATTHEWS, Plaintiff,**

v.

**Theodore M. HESBURGH, Chairman, Select Commission on Immigration and Refugee Policy et al., Defendants.**

Civ. A. No. 80–245.

United States District Court,
District of Columbia.

July 30, 1980.

Jules W. Lindau, Damascus, Md., for plaintiff.

Paul Blankenstein, Judith Scolnick, Thomas Millet, Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM OPINION

JOHN H. PRATT, District Judge.

*Summary*

Plaintiff, Dr. Harry Matthews, brings this action against the Members of the Select Commission on Immigration and Refugee Policy, its Executive Director, and the United States, alleging that he was terminated as the Commission's Coordinator of Public and Congressional Affairs for racial reasons in violation of the Fifth Amendment Due Process Clause, and without a hearing in violation of the procedural protections of the Due Process Clause. Plaintiff seeks reinstatement, back pay, and damages. Defendants have moved for summary judgment for reasons hereinafter discussed.

As a result of our consideration of the parties' contentions, we have granted partial summary judgment for defendants, finding that plaintiff was not entitled to any constitutionally-mandated due process procedural protections, and we have denied summary judgment on the issue of racial discrimination, finding that plaintiff has raised a genuine issue of material fact.

## I. *The Facts*

The Select Commission on Immigration and Refugee Policy (Commission) was created by Congress[1] to comprehensively review this country's immigration and refugee policies and laws, and to recommend revisions. The Commission is statutorily directed to make a final report of its findings and recommendations to the President and the Congress by March 1, 1981,[2] at which time the Commission will wind up its affairs and cease to exist.[3] Defendant Fuchs, the Executive Director of the Commission, offered plaintiff a position as the Commission's Coordinator of Public and Congressional Affairs on July 24, 1979. Plaintiff accepted the position on that date and began work with the Commission on August 15, 1979.[4] On December 18, 1979, defendant Fuchs informed plaintiff that he was discharging him effective February 1, 1980. Precisely what occurred between these dates is the subject of some dispute.

The affidavits of defendant Fuchs, Commission Special Assistant Sandra Stevens, and Commission Deputy Director Ralph Thomas allege numerous instances of plaintiff's substandard performance, including missing deadlines, failing to perform certain duties, and refusing to perform other duties when directed to do so. Defendant Fuchs' affidavit states that plaintiff's supervisory responsibilities were transferred to Special Assistant Stevens on November 15, 1979, and that plaintiff was notified of his termination for failure to properly perform his job on December 18, 1979. The Fuchs' affidavit also states that defendant Fuchs again informed plaintiff of the reasons for his termination on January 3, 1980, and that these reasons were put in writing

---

**1.** P. L. 95–412, 8 U.S.C. § 1151 note (1978 Supp.).

**2.** Section 4(d)(7) of P. L. 95–412, as amended by P. L. 96–132, § 23 Nov. 30, 1979, 8 U.S.C. § 1151 note (1980 Supp.).

**3.** *Id.*, § 4(h).

**4.** This information is contained in plaintiff's affidavit of May 18, 1980, at ¶ 2. The affidavit of plaintiff's wife, at ¶¶ 2, 3, states that plaintiff was offered the job by a telephone call from defendant Fuchs on July *23*, 1979, that plaintiff accepted the job and that he agreed to report to work on August 15, 1979. As between these two dates, we will accept the version given in plaintiff's affidavit, since he indicated the *day and the date* the offer was made and since the difference between these two dates is not material. However, the affidavit of defendant Fuchs, at ¶ 2, states that plaintiff was "hired" on August 15, 1979. To further confuse matters, Plaintiff's Counter-Statement of Facts in Opposition to Defendant's Motion for Summary Judgment, at 1, states that the "final job offer" to plaintiff was made August 15, 1979. (Plaintiff apparently started work on August 15, 1979. Affidavit of Dr. Lawrence Fuchs, at ¶ 5; Affidavit of Dr. Harry Matthews, ¶ 3). This represents a greater discrepancy. However, we will accept as true for purposes of this motion for summary judgment the facts as alleged in plaintiff's *affidavits.* Nevertheless, we admit to being troubled that plaintiff's counsel either was not aware of the conflicting material on this point which he submitted to this court, or that he was aware of the conflicts and felt no obligation to provide this court with any clarification or explanation.

by defendant Fuchs on January 4, 1980 at plaintiff's request.

Plaintiff concedes in his affidavit that at a November 15, 1979 meeting defendant Fuchs told plaintiff and others that the public affairs staff was not functioning properly, and that Special Assistant Stevens was being given supervisory responsibility for the public affairs staff. However, plaintiff's affidavits specifically rebut or deny many of the charges of substandard performance made in the affidavits of Fuchs, Stevens and Thomas, and plaintiff states that many of the criticisms made of his performance were actually the result of disorganization and mismanagement within the Commission. In particular, plaintiff states that he was often the victim of conflicting orders and requests issued by Stevens, Thomas and defendant Fuchs. Rather than being discharged for incompetence, plaintiff alleges that he was discharged for racial reasons and for other non-job related reasons.

Plaintiff's allegations center around the hiring of Nina Solarz, the wife of Congressman Stephen Solarz. Defendant Fuchs' affidavit states that he only offered plaintiff a position *after* Mrs. Solarz had been offered and had rejected the job. (*i. e.*, as between Mrs. Solarz and plaintiff, Mrs. Solarz was his first choice as Coordinator of Public and Congressional Affairs). Defendant Fuchs' affidavit also states that he succeeded in hiring Nina Solarz for the position "on or about December 17, 1979."[5] Plaintiff's affidavit states that on December 18, 1979 defendant Fuchs told him that he had decided to hire Mrs. Solarz, that he needed a slot in order to do so, and that he had decided to terminate plaintiff in order to make room for Mrs. Solarz. According to plaintiff's affidavit, defendant Fuchs named various staff members and explained why each could not be terminated to make room for Mrs. Solarz. In discussing one staff member, John Jones, plaintiff states that defendant Fuchs indicated he could not fire Mr. Jones because he was black.[6] On the basis of this conversation, which is not denied by defendant Fuchs,[7] plaintiff alleges that he was fired for racial considerations.

Prior to his termination, plaintiff was not given an opportunity for a hearing or an appeal. Although plaintiff was a federal employee, the legislation creating the Commission provided that the Commission could hire personnel without regard to civil service laws, rules and regulations.[8] Thus, plaintiff did not enjoy the procedural protections accorded civil service employees.

Plaintiff brings this action under the Due Process Clause of the Fifth Amendment against members[9] of the Commission, the United States, and Executive Director Fuchs individually and in his official capacity. Plaintiff alleges that he was denied a property interest in continued employment with the Commission and a liberty interest in obtaining other employment, both denials being in violation of due process procedural protections, and that he was discriminated against on the basis of race in violation of the Due Process Clause. Plaintiff seeks reinstatement, back pay, attorney's fees, costs, and exemplary damages of $50,000 against defendant Fuchs.

Defendants have moved for summary judgment, arguing that no liberty or property interest was infringed, that back pay and reinstatement are an inappropriate remedy, that sovereign immunity bars any award against the government and that official immunity bars any award against

---

**5.** Affidavit of Dr. Lawrence Fuchs, ¶ 2.

**6.** Plaintiff's affidavits contain two slightly different versions of this conversation, which are discussed below.

**7.** Defendant Fuchs' affidavit denies that the decision to terminate plaintiff was based on racial or political preference.

**8.** Section 4(e)(1), 8 U.S.C. § 1151 note.

**9.** The Commission is comprised of the Secretary of State, the Attorney General, the Secretary of Labor, the Secretary of the then Health, Education and Welfare, four members of the Senate Judiciary Committee, four members of the House Judiciary Committee and four individuals appointed by the President.

defendant Fuchs, and that plaintiff was fired for job-related reasons adding up to substandard performance and not for racial considerations.

## II. *Legal Analysis*

■ We begin with the well-established proposition that the mere fact of government employment, without more, does not of itself trigger any constitutional requirement that an individual be given a hearing or other procedural protections prior to dismissal. *Cafeteria and Restaurant Workers Union, Local 473, AFL–CIO, et al. v. McElroy, et al.,* 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1960); *Vitarelli v. Seaton,* 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959). In *Vitarelli,* the Supreme Court noted that an Interior Department employee who enjoyed no statutory protection under the Civil Service Act could be summarily discharged by the Secretary at any time without a reason being provided. Subsequent to these decisions, the Supreme Court increased the breadth of procedural protection under the due process clause. *See Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Bell v. Burson,* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); *Wisconsin v. Constantineau,* 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971); *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). However, as this Circuit's Court of Appeals has noted, "... as a threshold requirement the plaintiff in a public employee dismissal case must show that he has either a legitimate entitlement with respect to his job, which would be protected as property under the Fifth or Fourteenth Amendments, or that his dismissal deprives him of a liberty interest protected by those constitutional provisions .... Only if the court first finds that a 'liberty' or 'property' interest is affected will it go on to a balancing of interest analysis to determine what level of procedural protection is appropriate." *Mazaleski v. Treusdell,* 562 F.2d 701, 709 (D.C.Cir. 1977).[10]

### A. *Plaintiff's "Property Interest" in Continued Employment*

■ We turn to plaintiff's allegation that he was denied his property interest in continued employment with the Commission without due process of law as mandated by the Fifth Amendment. Plaintiff relies on *Board of Regents v. Roth, supra,* and its progeny for the proposition that his interest in continued employment with the Commission rose to the level of a constitutionally protected property interest requiring that he be afforded proper notice, a hearing, and a right of appeal prior to termination of his employment. We cannot agree.

■ As the court in *Roth* observed, "the procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits." *Board of Regents v. Roth, supra,* 408 U.S. at 576, 92 S.Ct. at 2708. Although constitutionally protected, these property interests are not created by the Constitution. "Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* at 577, 92 S.Ct. at 2709. In the case of a public employee, rules or understandings establishing that an employee would lose his job only for a job-related reason give the employee a property interest in the position affording him procedural due process protections prior to dismissal.[11] *Ashton v. Civiletti,* 613 F.2d 923 (D.C.Cir.1979).

**10.** In *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), a majority of the court concluded that the Fifth Amendment Due Process Clause does not require pretermination procedures when the statute establishing an employee's property interest in the job required only post-termination procedures.

**11.** Of course, if these rules or understandings gave an employee tenure or a clearly-defined term of employment, procedural due process protections would also attach. *See Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

■ It is undisputed in the instant action that plaintiff and other members of the Commission's staff who are *not* civil service employees do not enjoy the panoply of civil service procedural protections ordinarily accorded other federal workers.[12] It is also undisputed that no written contract exists which guarantees plaintiff employment with the Commission for a fixed term, or for a period of satisfactory job performance. Therefore, in order for plaintiff to have a property interest in his employment with the Commission, there must be a "mutually explicit understanding" supporting his claim of entitlement to continued employment. *See Perry v. Sindermann, supra,* 408 U.S. at 601, 92 S.Ct. at 2699. Such an understanding need not be embodied in a written contractual agreement. As the Supreme Court has noted:

> A written contract with an explicit tenure provision clearly is evidence of a formal understanding that supports a teacher's claim of entitlement to continued employment unless sufficient 'cause' is shown. Yet absence of such an explicit contractual provision may not always foreclose the possibility that a teacher has a 'property' interest in re-employment. For example, the law of contracts in most, if not all, jurisdictions long has employed a process by which agreements, though not formalized in writing, may be 'implied' .... Explicit contractual provisions may be supplemented by other agreements implied from 'the promisor's words and conduct in the light of the surrounding circumstances.'

*Perry v. Sindermann, supra,* at 601–02, 92 S.Ct. at 2699–2700.

Plaintiff's affidavit asserts that such an understanding supporting his claim to continued employment arose from his conversation with defendant Fuchs on July 24, 1979, in which defendant Fuchs offered plaintiff the position of Coordinator of Public and Congressional Affairs, and from earlier conversations with defendant Fuchs. More specifically plaintiff's affidavit states:

During the conversation and several previous conversations he told me that among the reasons he was hiring me was because of my political background, in having run for public office and having a large number of contacts among office holders in the government and in the labor movement. He said that this was important because I would be responsible for lobbying the legislation which the Commission would be drafting and which would be submitted to the Congress of the United States in the spring of 1981. He indicated that he would probably not even be in Washington full time in the spring of 1981 and that I would be responsible for 'walking the legislation through the Congress.' Dr. Fuchs told me that the life of the Commission would probably be extended sixty to ninety days because of the work involved in passing this legislation and he indicated that I would be one of the ones extended. On July 24, 1979 I accepted the offer made over the telephone by Dr. Fuchs. My wife was next to me during this conversation and overheard these conversations.

The affidavit of plaintiff's wife provides in relevant part:

2. I was with Harry Matthews when Lawrence Fuchs called him in Flagstaff on July 23, 1979,[13] and offered Harry a job with the Commission, and I heard most of what was said in the conversation.

3. Dr. Fuchs outlined the tasks he wanted Harry to perform with the Commission. He told Harry that Harry would be working on 'the Hill' in order to 'walk through' and 'lobby' the legislation in the Spring of 1981. Dr. Fuchs said he would probably be gone by the Spring of 1981 but he would need Harry to be in Washington full time through the Spring of 1981.

■ For purposes of this motion for summary judgment, we accept as true the facts

---

12. *See* § 4(e)(1), 8 U.S.C. § 1151 note.

13. See fn. 4.

alleged in both of these affidavits.[14] Even so, we cannot read these facts as providing a *"mutually* explicit understanding" that plaintiff would be employed by the Commission until the Spring of 1981, or that he would be employed by the Commission until the Spring of 1981 provided he satisfactorily performed his duties. We believe the only reasonable inference to draw from these affidavits is that defendant Fuchs was providing a description of the job he was offering plaintiff, and not that he was providing a guarantee of employment for a specified duration. The affidavit of plaintiff's wife in fact says just that: "Dr. Fuchs *outlined the tasks he wanted Harry to perform with the Commission.* He told Harry that Harry would be working on 'the Hill' in order to 'walk through' and 'lobby' the legislation in the Spring of 1981." (emphasis supplied).

This reading follows naturally from the affidavits of Dr. Fuchs and plaintiff.[15] It is clear from these affidavits that the position for which plaintiff was hired was one requiring a person who was familiar with politics and the political process and who was skilled in communications. Because the encumbent of this position was to be responsible for dealing with Congress, the encumbent would be the one with responsibility for lobbying in Congress, in the Spring of 1981, legislation which the Commission would draft. Given these undisputed facts, we can only conclude, without more, that the job offer to plaintiff telling him that he will be lobbying legislation before the Congress in the Spring of 1981 is a job offer describing the duties of the position which he was being offered, not a job offer carrying with it a guarantee that he would be employed until the Spring of 1981. To hold otherwise would in effect be to say that the thousands of federal employees who, like plaintiff, enjoy no Civil Service procedural protections, are entitled to constitutionally-mandated due process procedural protections *solely* by virtue of the fact that their job description includes responsibility for work on a project which will not be completed until a certain date and they are summarily dismissed before that date. We believe that more than this is needed to invoke Constitutional due process procedural protections.

Plaintiff, however, offers no more. The affidavits of plaintiff and his wife do not claim that he was ever promised a position for a specified duration.[16] Rather, as plaintiff's complaint indicates, he is asserting that "he had a reasonable expectation that his employment would continue until the Commission's work was completed." However, as the Supreme Court stated in *Perry v. Sindermann, supra,* at 603, 92 S.Ct. at 2700, a mere subjective expectancy is not sufficient to invoke procedural due process protections. To have a property interest in his employment with the Commission, plaintiff " . . . clearly must have more than an abstract need or desire for it. He must have more than a *unilateral expectation* of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents v. Roth, supra,* 408 U.S. at 577, 92 S.Ct. at 2709 (emphasis supplied). Here, plaintiff can point to no rules or mutually explicit understandings which are necessary to support his claim of entitlement if he is to invoke procedural due process protections.[17]

Plaintiff can point to no rules or regulations supporting his entitlement, since it is undisputed that in creating the Commission,

---

**14.** The affidavit of defendant Fuchs asserts that he never offered plaintiff employment for the duration of the Commission and that at staff meetings after plaintiff was hired he again made it clear that no one had any tenure or was assured of continued employment.

**15.** It is also consistent with the fact that Commission employees were not employees under Civil Service and lacked tenure.

**16.** Plaintiff's Counter-Statement of Facts, at 1, alleges that plaintiff was "promised" a job for the life of the Commission. However, no evidentiary support is cited for this assertion, and we can find none in the record. Mere allegations even in an affidavit, unsupported by specific facts, are insufficient to resist a motion for summary judgment. Rule 56(e), Fed.R.Civ.P.

**17.** *See Perry v. Sindermann, supra,* 408 U.S. at 601, 92 S.Ct. at 2699.

Congress specifically exempted employees hired by the Commission from any civil service procedural protections. As this Circuit's Court of Appeals has noted in referring to a similar statutory provision excepting FBI employees from civil service regulations relating to selection and tenure, "[s]tanding alone, the exception could suggest to an employee that he held his job at the sufferance of his employer." *Ashton v. Civiletti, et al., supra*, at 930. However, in *Ashton*, the court found that this exception did not stand alone, but that the FBI had clearly conveyed to the employee in that case that he had an expectation of continued employment as long as he performed his duties satisfactorily. For example, the court noted that in commenting on the meaning of this statutory exception, the FBI handbook issued to new employees said that what the new employee gave up was "any competitive status which you may have acquired previously." *Id.* The court found it significant that this explanation did not provide that employees were also giving up civil service protections against arbitrary dismissal. In the instant case, unlike in *Ashton*, there was no attempt to explain what rights would be forfeited by employees hired by the Commission.[18] More importantly, the court in *Ashton* specifically found that the handbook issued to Ashton and other employees provided that an employee in Ashton's position did not hold a position of limited duration but that such an employee "may assume that [his] position is secure, if [he] continue[s] to do satisfactory work." *Id.* at 929. As the court noted in referring to this provision: "[t]he Bureau could hardly have conveyed more precisely the understanding that appellant did not hold his position at the whim of his superiors and that he would lose his position only for behavior which impaired his efficiency or that of the Bureau." *Id.* No such explicit guarantee appears in the instant case, and plaintiff alleges none.

All plaintiff alleges is that he had an expectancy in continued employment with the Commission until the Commission's work was completed because he was described and offered a position with duties to be performed by the encumbent of that position in the Spring of 1981. Without more, and plaintiff alleges no more, we cannot find that plaintiff is able to escape summary judgment on this issue.

B. *Plaintiff's "Liberty Interest" In Obtaining Other Employment*

Plaintiff next alleges that his liberty interest in seeking other employment was infringed by his termination, and that he is entitled to procedural due process protections. Again, we must disagree.

The Supreme Court made clear in *Roth* that a government's action in terminating or not rehiring a non-tenured employee could take place under circumstances infringing an employee's constitutional right to liberty, requiring that the employee be accorded due process protections of notice and a right to a hearing. The court in *Roth* envisioned two general ways in which such an infringement of liberty could occur. The first is by injury to reputation. The government's reasons for deciding to terminate or not to rehire the employee could so stigmatize the employee that he has a right to notice and a hearing so that he may have an opportunity to clear his name. The second is by foreclosing future employment opportunities. The government could impose on the employee a disability foreclosing his freedom to take advantage of other employment opportunities. Plaintiff fails to allege facts bringing him under either of these categories.

The court in *Roth* indicated the scope of "reputational" injury in finding

---

**18.** Section 4(e)(1), 8 U.S.C. § 1151 note, does provide that any federal employee subject to civil service laws, rules and regulations may be *detailed* to the Commission without reimbursement, and such detail shall be without interruption or loss of civil service status or privilege. However, the legislation does not indicate that an employee *hired* by the Commission only loses some of the usual civil service protections, and we can find no such indication in the legislative history. Similarly, the parties have not directed our attention to any Commission rule or regulation bearing on this issue.

that a university teacher who was not rehired for a subsequent year was not so stigmatized that his liberty interest was infringed:

> The State, in declining to rehire the respondent, did not make any charge against him that might seriously damage his standing and associations in his community. It did not base the nonrenewal of his contract on a charge, for example, that he had been guilty of dishonesty, or immorality. Had it done so, this would be a different case. For '[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential.' *Wisconsin v. Constantineau*, 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515.

*Board of Regents v. Roth, supra*, 408 U.S. at 573, 92 S.Ct. at 2707. In the instant case, plaintiff does not allege that he has been accused of dishonest or immoral behavior. Rather, the charges against plaintiff, which he challenges, are that he was discharged because he failed to properly and competently perform his duties. As this Circuit's Court of Appeals has noted, charges of substandard performance do not amount to accusations of dishonesty or immorality or anything remotely approaching the nature of the degrading and unsavory stigmas which would expose an employee to public embarrassment and ridicule. *Mazaleski v. Treusdell, supra*, at 712, n. 28. Furthermore, plaintiff does not allege that defendants have conveyed the reasons for his discharge to others, which is a necessary element of proof if plaintiff is to prevail on a theory of reputational injury. *Bishop v. Wood*, 426 U.S. 341, 348, 96 S.Ct. 2074, 2079, 48 L.Ed.2d 684 (1976).[19]

 Therefore, if plaintiff's liberty interests have been infringed, it must be because defendant's actions foreclosed his freedom to take advantage of other employment opportunities. However, a dismissal or a failure to rehire an employee, without more, does not infringe a liberty interest. "It stretches the concept too far to suggest that a person is deprived of 'liberty' when he simply is not rehired in one job but remains as free as before to seek another." *Board of Regents v. Roth, supra*, 408 U.S. at 575, 92 S.Ct. at 2708. Furthermore, the dismissal must actually foreclose employment opportunities, not merely make an applicant less attractive to a prospective employer. "Mere proof, for example, that his record of nonretention in one job, taken alone, might make him somewhat less attractive to some other employers would hardly establish the kind of foreclosure of opportunities amounting to a deprivation of 'liberty.'" *Id.* at 574, 92 S.Ct. at 2707. This Circuit's Court of Appeals has held that dismissal from a government position for substandard performance and insubordination does not foreclose an employee's job opportunities. "The barrier of which appellant complains is a practical, not legal, one, however. He argues rather that he has been deprived of liberty since disclosure of the reasons for his termination to prospective employers would '*impair* his ability to find other employment in his chosen field' .... To infringe one's liberty, the effect of government action on future employment must extend beyond a disadvantage or impediment ...." *Mazaleski v. Treusdell, supra*, at 713.

We therefore conclude as a matter of law that plaintiff has suffered no infringement of any liberty interest sufficient to invoke constitutional due process procedural protections.

### C. *Plaintiff's Allegation of Racial Discrimination*

 Plaintiff's complaint also alleges that he was denied due process of law as mandated by the Fifth Amendment because his termination was influenced by racial considerations. We find that plaintiff has raised a genuine issue of material fact requiring a trial on this issue.

---

19. Public disclosure of the reasons in a judicial proceeding commencing after the alleged injury for which the plaintiff seeks redress cannot provide retroactive support for his claim. *See Bishop v. Wood, supra*, at 348, 96 S.Ct. at 2079.

 Unlike the Fourteenth Amendment, the Fifth Amendment contains no express equal protection clause. However, the Supreme Court "has held that the Due Process Clause of the Fifth Amendment forbids the federal government from denying equal protection of the laws." (citations omitted). *Vance v. Bradley*, 440 U.S. 93, 95, n. 1, 99 S.Ct. 939, 942 n. 1, 59 L.Ed.2d 171 (1979). "Thus, if a classification would be invalid under the Equal Protection Clause of the Fourteenth Amendment, it is also inconsistent with the due process requirement of the Fifth Amendment." *Johnson v. Robison*, 415 U.S. 361, 364–65, n. 4, 94 S.Ct. 1160, 1164, 39 L.Ed.2d 389 (1974). It is therefore clear that a claim for racial discrimination is cognizable under the Fifth Amendment Due Process Clause. The equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment. *Buckley v. Valeo*, 424 U.S. 1, 93, 96 S.Ct. 612, 670, 46 L.Ed.2d 659 (1976).

Plaintiff's two affidavits offer slightly different versions of the factual allegation of racial discrimination. Plaintiff's affidavit of May 18, 1980 states:

On December 18, 1979, Dr. Fuchs told me that ... he had decided to hire Nina Solarz, the wife of Congressman Stephen Solarz, and that he needed a slot in order to do so. He said all signs point to me as the one who has to go. He said it was obvious that Sandra Stevens could not manage public affairs. He said that he could not let Elaine Daniels go because she did not make enough money. Tom Surh, he said, was too new. John Jones

was a lawyer and black, and Fuchs said that is very important.

Plaintiff's supplemental affidavit of May 18, 1980 states:

On December 18, 1979, Dr. Fuchs told me that he was unhappy with John Jones but he could not fire him because 'he is black, and that is so very important.'

The affidavit of defendant Fuchs states that "[t]he final decision to terminate Dr. Matthews was never predicated upon racial or political preference but an evaluation of his work performance." Affidavit of Dr. Lawrence Fuchs, ¶ 12. However, the affidavit of defendant Fuchs does not deny that he made the statements plaintiff alleges.

 Proof of a racially discriminatory intent or purpose is necessary to show a violation of the Equal Protection Clause. *Village of Arlington Heights, et al. v. Metropolitan Housing Development Corp., et al.*, 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977). A racially discriminatory intent need not be the sole basis of the complained of action. However, it is necessary to prove for plaintiff that a racially discriminatory purpose was a motivating factor in the decision. *Id.* at 265–66, 97 S.Ct. at 563. Taking as true the undisputed statements attributed to defendant Fuchs by plaintiff in his affidavit, we find that plaintiff has raised a genuine issue of material fact as to whether a racially discriminatory purpose was a motivating factor in his termination from the Commission by defendant Fuchs. We therefore deny defendants' motion for summary judgment on this issue.[20]

---

**20.** Defendants' Motion for Summary Judgment also argues that plaintiff's claim for reinstatement and back pay is barred by the doctrine of sovereign immunity and that plaintiff's claim against defendant Fuchs is barred by the doctrine of official immunity. We find it unnecessary to express any view on these arguments at this time. Counsel will be required to brief these issues in preparation for trial in light of the Supreme Court's holding in *Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979). Although plaintiff's complaint is silent as to any alleged violation of First Amendment rights, Plaintiff's Points and Authorities in Opposition to the Defendants' Motion for Summary Judgment, at 6, alleges that plaintiff's First Amendment rights were violated because defendant Fuchs allegedly fired plaintiff for political reasons. In support of this allegation, plaintiff offers only his statement in his affidavit that defendant Fuchs said "that it was good that Nina Solarz was coming on because her husband was to announce his support for President Carter in the near future." Affidavit of Dr. Harry Matthews, ¶ 26. We are somewhat puzzled by plaintiff's allegation of a First Amendment violation on the basis of this allegation. *See Elrod v. Burns,*

An order consistent with the foregoing has been entered this day.

427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Branti v. Finkel (and Alan Tabakman),* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). However, at this time we do not consider this issue, since this allegation is not contained in plaintiff's complaint. If, after further research, plaintiff determines he has a cognizable First Amendment claim, he may move for leave of court to amend his complaint.