**Frank BUTTINO, Plaintiff,**

v.

**FEDERAL BUREAU OF INVESTIGATION, et al., Defendants.**

**No. C–90–1639–SBA.**

United States District Court, N.D. California.

Feb. 12, 1992.

On Motion for Reconsideration July 31, 1992.

Richard Gayer, San Francisco, Cal., for plaintiff.

William T. McGivern, U.S. Atty., San Francisco, Cal., Mary E. Goetten, Tracy L. Merritt, Attys., Dept. of Justice, Washington, D.C., Motion for Summary Judgment, William T. McGivern, U.S. Atty., San Francisco, Cal., Mary E. Goetten, Kevin E. Simpson, Robert A. Van Kirk, Attys., Dept. of Justice, Washington, D.C., Motion for Reconsideration, for defendants.

ORDER GRANTING IN PART AND DE-
NYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDG-
MENT

ARMSTRONG, District Judge.

OVERVIEW

Plaintiff Frank Buttino brought this lawsuit to challenge the revocation of his secu-

rity clearance and the termination of his employment as a Special Agent with the Federal Bureau of Investigation (the "FBI"). Plaintiff claims that he was deprived of his right to due process under the Fifth Amendment of the United States Constitution, his rights to freedom of speech and freedom of association under the First Amendment, and his right to equal protection under the Fifth Amendment. He also brings a *Bivens* claim against FBI Director William Sessions.

The matter is currently before the court on defendants' motion for summary judgment.[1] Having carefully considered all of the papers submitted by the parties, the court HEREBY GRANTS summary judgment as to plaintiff's due process and First Amendment claims and DENIES summary judgment as to plaintiff's equal protection claim.[2]

## BACKGROUND

Frank Buttino joined the FBI as a Special Agent in 1969. During his twenty-year tenure with the agency, his assignments included undercover work and criminal and foreign intelligence. He performed investigations involving espionage, Chinese affairs, and terrorism. He received four special commendations as well as numerous cash awards for his service as a Special Agent, and the FBI has stated that it has no information to indicate that plaintiff ever failed to safeguard either the classified information or the money with which plaintiff was entrusted during his tenure with the agency. Buttino is gay.

In August, 1988, the FBI received an undated, handwritten letter stating that Buttino engaged in homosexual activity and enclosing a second handwritten letter to "James" signed "Frank," describing certain homosexual activities. The FBI then initiated an administrative inquiry regarding Mr. Buttino which resulted in the FBI's revocation of Buttino's Top Secret security clearance and, in turn, the termination of his employment.[3]

The parties agree to little else about the facts. Defendants describe plaintiff as being "repeatedly deceptive" during their investigation, while Buttino denies all deception other than initially lying when he denied writing the note to "James." Buttino states that he understood that he would have been fired if he had admitted the truth about the note, and that he corrected the lie when he was called back to FBI Headquarters on the matter five weeks later.

The defendants say that plaintiff's security clearance was revoked because he was deceptive, because he disclosed information he was not supposed to, and because he was uncooperative in their investigation. Plaintiff claims his security clearance was revoked because he is gay, consistent with the FBI's traditional anti-gay policy. He says the FBI's contention that he was fired because of his "lack of candor" is a mere pretext for the agency's anti-gay discrimination and that non-gay employees "guilty" of similar degrees of lack of candor or improper disclosure of information do not

---

1. Plaintiff has also amended his complaint to expand this case into a class action. The class has yet to be certified and this summary judgment motion is directed only at plaintiff's individual claims.

2. Plaintiff's equal protection claim is the primary focus of this lawsuit. The due process claim is precluded under *Dorfmont v. Brown*, 913 F.2d 1399 (9th Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 1104, 113 L.Ed.2d 214 (1991), *see* Discussion, Section I, *infra,* and plaintiff has offered no response specific to defendants' arguments for dismissal of the First Amendment claims. The *Bivens* claim is not addressed by either party. The Discussion, *infra,* focuses on the equal protection claim.

3. On September 25, 1989, the FBI's Security Programs Manager, Mr. Gary L. Stoops, proposed revoking plaintiff's security clearance, and plaintiff was then placed on administrative leave. Mr. Stoops informed plaintiff of the FBI's final decision to revoke his security clearance on January 31, 1990. Plaintiff appealed the revocation of the security clearance to the Department of Justice, and by letter dated May 29, 1990, Department of Justice Security Officer, D. Jerry Rubino, notified plaintiff that the revocation of his security clearance was affirmed. Because every FBI employee must have a Top Secret security clearance, plaintiff's employment with the FBI was terminated by letter dated June 20, 1990.

suffer punishment anywhere near that which he suffered.

Buttino seeks reinstatement. He has given defendants "unrestricted permission" to tell anyone they desire about his sexual orientation and conduct.

## DISCUSSION

I. *The Reviewability of Plaintiff's Equal Protection Challenge to the Revocation of his Security Clearance.*

█ Defendants first argue that the revocation of plaintiff's security clearance is "not judicially reviewable" because such determinations are highly discretionary and are constitutionally committed to the Executive Branch. They cite *Department of the Navy v. Egan*, 484 U.S. 518, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988) and *Dorfmont*, in support of this argument. It is clear under *Egan* and *Dorfmont* that courts should be highly deferential in reviewing the denial or granting of security clearances for the reasons defendants indicate. *Dorfmont*, in fact, specifically held that a person cannot raise due process challenges to the revocation of a security clearance.

Defendants overstate the scope of *Dorfmont*, however. *Dorfmont* specifically refrained from ruling that all constitutional attacks on security clearance determinations cannot be heard, and acknowledged that *Webster v. Doe*, 486 U.S. 592, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988), *Dubbs v. CIA*, 866 F.2d 1114 (9th Cir.1989) (*"Dubbs I"*), and *High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563 (9th Cir. 1990), "stand for the proposition that federal courts may entertain colorable constitutional challenges to security clearance decisions." *Dorfmont*, 913 F.2d at 1404. Significantly, *Dubbs I* and *High Tech Gays* both involved equal protection challenges to security clearance determinations.

Nevertheless, not only did *Dorfmont* stop short of holding that equal protection challenges to security clearance decisions are nonreviewable, but *Dorfmont* certainly did not speak to the situation in which there is an allegation of the government's *pretextual* revocation of a security clear-

ance, which is really the essence of plaintiff's complaint. Indeed, only a strained reading of *Dorfmont* (when considered in tandem with *High Tech Gays* and *Dubbs I* ) would support the shielding of the government's revoking a security clearance where such revocation is a mere pretext for the implementation of a discriminatory policy. To construe *Dorfmont* in that way would be to invite those government officials, who have both the authority to make security clearance determinations and the desire to discriminate against a certain class of persons, to effect such discrimination *through* their security clearance decision-making authority with the comfort of knowing that the nonreviewability of the "merits" of security clearance determinations would serve to immunize the *discrimination* from judicial review. Defendants have not persuaded the court that either *Dorfmont* or any accepted constitutional principles compel such a result.

In fact, Judge Eugene Lynch of this District expressly rejected rendering equal protection challenges to security clearance determinations nonreviewable *per se* in *Dubbs v. CIA*, 769 F.Supp. 1113 (N.D.Cal. 1990) (*"Dubbs II"*). In so doing, Judge Lynch stated:

> The court accepts, as a general matter, the language in *Egan* which indicates that courts ought to be extremely deferential in reviewing issues such as the denial or granting of security clearances that are constitutionally committed to the Executive Branch and involve highly discretionary decisions requiring specialized expertise. *See Egan*, 484 U.S. at 527–530, 108 S.Ct. at 824–826. However, such deference to Executive Branch decisions does not require the Judiciary to abdicate its authority under Article III to decide whether or not an individual's right to equal protection under the Federal Constitution has been violated.

*Dubbs II*, 769 F.Supp. at 1116 n. 3. Judge Lynch continued:

> More importantly, defendants' argument requires this Court to presume that they have acted rationally in the present case and would be acting rationally in any case where they deny an individual a security clearance because of her homo-

sexual orientation and conduct. This standard, while not wholly unprecedented in constitutional jurisprudence, would effectively eviscerate the *Dubbs* [9th Circuit] panel's decision that plaintiff's equal protection claims are colorable [citation omitted], something which this Court is not at liberty to do in the absence of a contrary decision from the Ninth Circuit or a higher court.

*Id.* at 1116–1117.[4]

Judge Lynch's refusal to condone the abdication of an Article III Judge's authority to adjudicate constitutional equal protection claims notwithstanding the need for deference to Executive Branch decisions rests on more, of course, than mere separation-of-powers technicalities. The implication of the judiciary's divesting itself *entirely* of its role in reviewing colorable constitutional claims is, to put it mildly, unsound as a matter of policy because the result of adopting such a rule would be to effect the wholesale shielding of any *actual* deprivations of equal protection occurring in the course of the Executive Branch's allocation of security clearances.

To be comfortable with such a rule is to be blind to the historical reality that "national security" has frequently been asserted as the ostensible justification for sweeping deprivations of equal protection which, with hindsight, are nearly universally condemned and readily regarded as, at best,

grossly disproportionate to the national security concerns at one time asserted as justifications.[5]

Accordingly, neither the governing authority nor considerations of policy justify adopting a rule of law by which courts would be barred from engaging in *any* equal protection review of security clearance decisions.[6] Buttino's equal protection challenge to the FBI's revocation of his security clearance is not, therefore, inherently nonreviewable. As such, the court must proceed to considering whether a reasonable jury could find that plaintiff was discriminated against because of his homosexuality in the revocation of his security clearance, and, if so, whether there was a rational basis for such discrimination.

II. *Is there a Triable Issue of Fact as to Whether Plaintiff's Security Clearance Would Have Been Revoked and His Employment Terminated But For the Fact that He is Gay?*

Federal Rule of Civil Procedure 56(c) provides for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Summary judgment should be granted "unless there is sufficient evidence favoring the non-mov-

---

**4.** Judge Lynch's reasoning is not undermined by the subsequent *Dorfmont* decision, because, as indicated, *Dorfmont* was specifically limited to due process challenges and acknowledged that other Ninth Circuit cases condoned equal protection review of security clearance determinations. Likewise, defendants' suggestion, in their reply brief at 11 n. 9, that *High Tech Gays* may undermine the reviewability of gay equal protection claims (since *High Tech Gays* established that gay equal protection claims are (only) subject to rational basis review) is unsupportable. Judge Lynch explicitly addressed that point in *Dubbs II, see* 769 F.Supp. at 1117, and pointed out that the very fact that *High Tech Gays* engaged in a rational basis *review* of the gay plaintiffs' equal protection claim is squarely inconsistent with defendants' notion that such claims are *non* reviewable.

**5.** The internment of Japanese Americans during World War II (in order to safeguard against "sabotage and espionage," *see Hirabayashi v.*

*United States,* 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943), and *Korematsu v. United States,* 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944)) and the strict segregation of Blacks and Whites in the United States armed forces (in order to preserve "morale" necessary to effectively defend the national security), terminated in 1948 by Exec. Order No. 9981, 3 C.F.R. 722 (1941–1948), are but two examples. The fact that, as *Hirabayashi* and *Korematsu* illustrate, even the judiciary has, at times, failed to curb unconstitutional abuses of security-related discretion hardly supports the *further* shielding of such discretion from judicial review as defendants would have this court do.

**6.** The Supreme Court has also made clear that even the "extensive rummaging around in" a national security agency's affairs that would likely occur in the course of judicial review of an agency's termination of a gay employee does not justify preclusion of such review. *See Webster,* 486 U.S. at 604, 108 S.Ct. at 2054.

ing party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). If the only conclusion a reasonable jury could reach is that Mr. Buttino's security clearance would have been revoked even if he were heterosexual, then as a matter of law plaintiff could not succeed on his equal protection claim and summary judgment would be appropriate.

Defendants argue that summary judgment must be granted because plaintiff "completely fails to present any colorable evidence" that his security clearance was revoked because he is gay. Defendants' argument fails for two reasons.

### A. Defendants Have Not Satisfied their INITIAL BURDEN on a Motion for Summary Judgment

■ First, defendants are wrong in their threshold assumption that they have met their initial burden on a motion for summary judgment [7] by submitting the declaration of D. Jerry Rubino, the Department of Justice Security Officer who affirmed the FBI's revocation of plaintiff's security clearance on appeal. Even taken at face value, Mr. Rubino's declaration does not demonstrate the absence of a genuine issue of fact as to whether plaintiff's security clearance would have been revoked but for plaintiff's homosexuality. Although Mr. Rubino apparently had the authority to set aside the FBI's decision to revoke plaintiff's security clearance,[8] his statement that his affirmance of the FBI's revocation of the security clearance was made on the basis of reasons other than plaintiff's homosexuality [9] does not go to the principal allegations of discrimination in plaintiff's lawsuit: namely, that the FBI's own investigation and determination of plaintiff's fitness for continued service were tainted by (and predetermined by) antigay bias *within the FBI*. Indeed, Mr. Rubino presumably did not even become involved in the matter until after the FBI had *completed* its investigation and had revoked plaintiff's security clearance which plaintiff *then* appealed to the Justice Department. Defendants have not, accordingly, met their initial burden on the motion for summary judgment of demonstrating the absence of a genuine issue of fact on the strength of Mr. Rubino's declaration.[10]

### B. Plaintiff, In Any Event, Has Presented Evidence from Which a Reasonable Jury Could Infer Discrimination

Second, even if defendants had satisfied their initial burden by virtue of Mr. Rubi-

---

7. The moving party bears the initial burden of demonstrating the *absence* of genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986).

8. Plaintiff disputes this authority "in part." Pl.'s Response to Defs.' Statement of Undisputed Material Facts at 2:20–3:3. But plaintiff's "dispute" of that authority appears to be more of a restatement of his argument that the FBI has an anti-gay policy rather than a presentation of any evidence refuting Mr. Rubino's *authority* to set aside the FBI decision.

9. Mr. Rubino states that his decision was based upon his belief that Mr. Buttino placed himself in a position that may have subjected him to coercion or pressure to act contrary to the best interests of the national security, was not truthful in answering questions posed during the FBI's inquiry [the court ruled on December 31, 1991 that inferences of untruthfulness on plaintiff's part will not be drawn to the extent that they depend exclusively on the results of polygraph examinations], and failed to cooperate fully during the administrative investigation. Rubino Decl. ¶ 6.

10. *Defendants' suggestion that plaintiff can only withstand summary judgment by directly attacking Rubino's credibility is therefore inapposite, since even if wholly credible, Rubino's declaration does not put to rest the question of whether the FBI used plaintiff's homosexuality against him. Frederick S. Wyle Prof. Corp. v. Texaco, Inc.,* 764 F.2d 604, 608 (9th Cir.1985), cited by defendants, is distinguishable in that the court there found that there was *not* a genuine issue of material fact in the absence of any reason to suspect the affiants' credibility. In any event, a plaintiff can show pretext, as Buttino alleges here, even without directly impeaching the credibility of the employer's proffered explanation, if the plaintiff otherwise directly persuades the court that a discriminatory reason "more likely motivated the employer." *Cotton v. City of Alameda,* 812 F.2d 1245, 1248 (9th Cir.1987) (quoting *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981)).

no's declaration, the court finds that plaintiff, in his opposition, has presented ample evidence from which a reasonable jury could infer, notwithstanding Mr. Rubino's declaration, (1) the existence of anti-gay bias within the FBI *generally* and (2) the *specific* effect of such bias on the investigation into, and the decision regarding, plaintiff's continued fitness for a security clearance. The evidence presented by plaintiff from which a jury could infer such discrimination is substantial.

1. *The Disparity in Plaintiff's Treatment after the FBI Learned He Was Gay and the FBI's Interest in the Names of OTHER Homosexuals in the FBI*

Plaintiff has attested to the vast disparity between the FBI's interest in his personal life when the agency assumed plaintiff was heterosexual and when they learned he was gay, as well as to the FBI's attempts to get him to divulge the names of other gay people in the agency:

> For 19 years of my employment with the FBI they assumed I was heterosexual and did not ask me about personal details of my heterosexual conduct or the names of my heterosexual friends. When I disclosed that I engaged in heterosexual sex with a female FBI agent they did not ask for any details about this conduct or this person's name. However, they wanted to know every detail about my homosexual conduct, including exactly what kinds of sex acts I engage in with other men. They also wanted the names of other homosexuals in the FBI and the names of my homosexual, but not heterosexual friends.

Buttino Decl. at 4:4–11.

2. *The Fact that the FBI Investigated Plaintiff upon Being Advised that Plaintiff Engaged in Homosexual Activities*

Defendants themselves describe the investigation into whether plaintiff was a security risk as being in response to the FBI's being advised "that plaintiff engaged in homosexual activity." One reasonable inference is that the FBI would not have considered information that a highly commended twenty-year Special Agent "engaged in *heterosexual* activity" grounds to undertake an investigation into his continued fitness for a security clearance, and that the very investigation resulting in plaintiff's termination would therefore not have been undertaken if plaintiff were not gay.

3. *Evidence that the FBI's Punishment for Plaintiff's "Lack of Candor" was More Severe than the Agency's Punishment for Lack of Candor Generally*

Plaintiff has submitted evidence from the FBI's own documents which indicates that the measures taken against Buttino (revocation of his security clearance and dismissal) were more severe than the FBI otherwise takes in cases of similar—or more serious—findings of "lack of candor" and improper disclosure of information. *See* Exs. 11, 12 to Declaration of Richard Gayer; Pl.'s Opp'n at 9–11. Those documents suggest that the typical punishment for indiscretions of roughly similar seriousness appears to be censure, probation of six months to one year, and suspension without pay for 7 to 60 days.

4. *The Evidence of the FBI's Undisputed History of Anti-Gay Discrimination*

Plaintiff has submitted evidence—and indeed it is undisputed—that the FBI has had a history of anti-gay discrimination. In 1979, the FBI formally represented to the United States Court of Appeals for the District of Columbia:

> The Federal Bureau of Investigation has always had an absolute policy of dismissing proven or admitted homosexuals from its employ.

*Ashton v. Civiletti,* 613 F.2d 923, 926 (D.C.Cir.1979). As recently as four years ago, the D.C. Circuit explicitly found that the FBI *still* had a policy of discrimination against gays. Citing various statements and letters by the FBI, the court concluded that "we still can find no indication that the FBI renounced homosexuality as a basis for reaching employment decisions.... Arguably, the FBI has committed itself not

to consider the sexual orientation of an applicant who can show he does not engage in sex, but it clearly has done no more." *Padula v. Webster*, 822 F.2d 97, 101 (D.C.Cir.1987). And in a June 5, 1989, letter from Milt Ahlerich, Assistant Director, FBI Office of Public Affairs, the FBI specifically referred to the *Padula* case in which the D.C. Circuit found the FBI still had a policy of discrimination and stated: "[T]here are no plans underway to change the FBI's policy regarding homosexuals." [11]

### 5. *The Declarations of Other Gay or Lesbian Employees and Applicants*

Plaintiff has submitted declarations of five individuals—three former FBI employees, a current employee, and a rejected applicant—all of whom attest to anti-gay bias within the FBI. A reasonable jury could certainly construe these declarations as corroborating plaintiff's characterization of the FBI's treatment of employees it learns are gay. The declarations evidence the FBI's extensive inquiries into its gay employees' private sexual activities—including detailed inquiries into specific private sexual acts and the exploration of childhood sexuality. The declarations describe the FBI investigators' attempts to obtain the names of *other* gay employees in the FBI. The declarations describe the FBI's threats that gay employees "resign quietly" or risk being fired. And, significantly, at least one of the declarations asserts that the FBI investigators made allegations of "lack of candor" by "twisting" the gay employee's words "at every turn." [12]

The court is bound, on a motion for summary judgment, to draw all justifiable inferences in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). In view of the foregoing evidence submitted by plaintiff, the court believes that a reasonable jury could conclude

---

**11.** Defendants contend that the "past" policies of the FBI, and in particular the findings of the *Ashton* case, are irrelevant here because those policies have undergone "some modifications" since *Ashton* was decided. Defs.' Reply at 17 n. 16. Defendants cite *Cotton v. City of Alameda*, 812 F.2d 1245, 1248 (9th Cir.1987) to support their position. *Cotton,* however, only questioned the relevance of past policies that were "terminated" and said nothing about discriminatory policies that were merely "modified," the former, of course, being precisely the issue here. The distinction is significant because the *similarities* of the current policies to the past policies could conceivably be *more* telling as to the true character of the current policies than are the "modifications" that may have occurred over time. There are, for example, strong inferences that a reasonable jury could draw regarding the *credibility* of the current explanations for the FBI's policies toward gays (which goes to those policies' "rationality" under the Constitution—*see* Section III, *infra*), where the FBI's current (public) pronouncements of its policies somehow reach the identical *conclusions* that the *past* ones did (*i.e.,* that the employment of gay persons creates significant security risks) notwithstanding the disappearance, at least in public pronouncements, of the patently unsupportable reasons which were offered in the past to justify the same conclusions now reached. *See* Senate Committee on Expenditures, *Employment of Homosexuals and Other Sex Perverts in Government, Interim Report,* S.Doc. No. 241, 81st Cong., 2d. Sess. (1950) (Senate Committee report indicating that the FBI was inte-

gral to a crusade in the 1950's to eliminate all "homosexuals and other sex perverts" from not only its own employ but from all federal government agencies because they constituted security risks).

**12.** The court believes that items 1 through 5, *supra,* (and probably # 1 alone) are sufficient to establish a triable issue of fact as to whether or not plaintiff's homosexuality was the real (or principal) reason for the revocation of his security clearance. The court notes, however, that plaintiff has submitted even further evidence which simply reinforces the court's finding that there is, at least, a triable issue of fact on the question of whether Mr. Buttino would not have been fired but for his homosexuality. Such further evidence includes, *inter alia:*

a. Internal FBI files which indicate significant interest on the part of the FBI in anything hinting of homosexuality in the lives of its employees; and

b. Director William Sessions' statement in his September 6, 1990 letter to Congressman Don Edwards that the Director was unaware of "any" openly gay Agents in the FBI, rendering questionable the *effective* validity of defendants' purported policy of tolerating "open" gays. *See* Defs.' Statement of Material Facts Not in Dispute, ¶ 13. (The parties note that two (of the FBI's 20,000) employees have retained their employment notwithstanding the recent discovery that they are gay. Plaintiff points out that such discovery appears to have occurred *since* the filing of this lawsuit. Pl.'s Opp'n at 19 n. 21.)

that plaintiff's security clearance would not have been revoked and his FBI employment would not have been terminated if plaintiff were not gay.

III. *If There IS a Triable Issue of Fact as to whether Plaintiff Was Discriminated Against Because He is Gay, Is it Nevertheless Clear that there was a Rational Basis for so Discriminating Against Him?*

 Notwithstanding the triable issue of fact as to whether plaintiff was discriminated against because he is gay, summary judgment would be appropriate if such discrimination is nevertheless rationally related to a legitimate governmental interest. *High Tech Gays*, 895 F.2d at 571.[13] The legitimacy of the government's interest in safeguarding classified information is incontrovertible. *Id.* at 574. The only question is whether the FBI's discrimination against gays, if proven, is rationally related to that legitimate governmental interest.

A. The Applicability of High Tech Gays

Defendants do not mount a significant argument to support a finding, at this juncture, that the FBI's alleged discrimination is rational as a matter of law. They cite *High Tech Gays* as ostensible authority for

the proposition that even if the facts plaintiff alleges are true, the FBI would have had a rational basis for revoking plaintiff's security clearance. For at least three reasons, however, *High Tech Gays* does not compel a finding (on this motion for summary judgment) that the FBI's discrimination against gays, as alleged by Mr. Buttino, is rational as a matter of law.[14]

First, the existence of the anti-gay policy in *High Tech Gays* was not disputed. There, the Department of Defense expressly conceded its policy of conducting expanded investigations into the backgrounds of all gay and lesbian applicants for security clearances, such that the court, unlike here, was able to assess the rationality of a known quantity. The current status of this case is much more analogous to *Dubbs II*, 769 F.Supp. at 1118, decided after *High Tech Gays*, in which the court identified the need, as a trier of fact, to "first make findings regarding the factual issues of what the CIA's policy toward homosexuals and/or persons who engage in homosexual conduct actually is" before it could determine whether there was a rational basis for that policy. As in *Dubbs II*, it would be anomalous indeed for this court to sanction, as conclusively rational, discrimination whose very existence is denied by its al-

---

**13.** The court notes that the requirement that anti-gay discrimination be subjected only to "rational basis" review, rather than to either "heightened" or "strict" scrutiny, is the object of considerable distinguished criticism. *See, e.g.,* the opinion of the Chief Judge of this Court, The Honorable Thelton E. Henderson, in *High Tech Gays v. Defense Indus. Sec. Clearance Office,* 668 F.Supp. 1361, 1368 (N.D.Cal.1987), *rev'd,* 895 F.2d 563 (9th Cir.1990); the concurring opinion of The Honorable William A. Norris of the Ninth Circuit in *Watkins v. United States Army,* 875 F.2d 699, 711–731 (9th Cir.1989), *cert. denied,* — U.S. ——, 111 S.Ct. 384, 112 L.Ed.2d 395 (1990); the concurring opinion in the same case of The Honorable William C. Canby, Jr. of the Ninth Circuit, 875 F.2d at 731; L. Tribe, *American Constitutional Law* § 16–33 at 1616 (2d ed. 1988); J. Ely, *Democracy and Discontent* at 162–164 (1980); The Editors of the Harvard Law Review, *Sexual Orientation and the Law* 54–61 (1989); Note, *An Argument for the Application of Equal Protection Heightened Scrutiny to Classifications Based on Homosexuality,* 57 S.Cal.L.Rev. 797, 816–27 (1984).

**14.** Defendants make a *"see also"* reference to *Padula v. Webster,* 822 F.2d 97 (D.C.Cir.1987) in which the D.C. Circuit found there was a rational basis for the FBI's discriminating against a lesbian applicant. Defendants do not make too much of the case, however, presumably because the court explicitly found that the FBI actively discriminates against gays, *see* Section II.B.4., *supra,* which is exactly what defendants are *denying* in this case. Moreover, the D.C. Circuit's reasoning in *Padula,* which cited in support of its finding that the discrimination was rational the fact that homosexual conduct "generate[s] dislike and disapproval among many ... who find it morally offensive" is arguably of questionable soundness in the Ninth Circuit after *Pruitt v. Cheney,* 963 F.2d 1160 (9th Cir. 1992), which held that discriminatory policies which simply give effect to society's prejudices do not suffice under the rational basis test. *See* discussion, *infra.*

leged perpetrator.[15]

Second, *High Tech Gays* found the Department of Defense's policy to be rational only after an *evidentiary inquiry* specific to the question of the rationality of the relationship of the policy to the government interest the policy was purported to serve. Finding specific evidence that hostile Soviet intelligence elements targeted American homosexuals for blackmail, and after weighing evidence submitted by the plaintiffs offered to refute the rationality of discrimination in that context, the court concluded that the expanded inquiry into gay persons' security clearance applications was rationally related to the government's interest of safeguarding national security. *High Tech Gays*, 895 F.2d at 574–578. Here, the FBI has not purported to submit evidence by which this court could make an assessment of the rationality of its alleged discriminatory policy.[16]

Third, the court in any event has serious reservations about somehow treating as binding on this action the Ninth Circuit's ruling in *High Tech Gays* that the Defense Department's discriminatory policy against gays was rational, where the current validity of the very basis for that ruling (evidentiary findings that the K.G.B. specifically targeted American homosexuals) would appear to be in question in light of the post-*High Tech Gays* demise of the Soviet Union and the uncertain future, if any, of the Soviet Secret Police. *See* David Wise, "Closing Down the K.G.B.", *N.Y. Times*, November 24, 1991, § 6, at 30.[17] *High Tech Gays* binds this court to apply only a rational basis review to cases of actual anti-gay discrimination, but nothing in that case, or in any other Ninth Circuit case for that matter, directs this court either to ignore its obligation to assess the rationality of a discriminatory policy or to embrace obsolete justifications therefor, and this court declines to do so.[18]

15. This is not to say that a court, on a motion for summary judgment, could never find a rational basis for discriminatory conduct where a defendant denies the existence of such discrimination. On the contrary, a blanket rule to that effect would put a defendant in the untenable posture of having to forfeit his opportunity to pursue summary dismissal if he chooses to deny the allegations of unconstitutional discrimination. The key inquiry would appear to be whether the evidence the parties set forth in connection with a motion for summary judgment leaves the court, as it does here, with genuine issues of fact both as to the *existence* of discrimination and as to the *character* of such discrimination which so obscure the nature of the discrimination as to deprive the court of a firm sense of the *actual* discrimination whose rationality the court must ultimately assess.

16. Again, *Dubbs II* is germane:
 After determining the policy and the government interests served by it, this Court then must determine what are the reasons for this policy which indicate, or fail to indicate, that this policy is rationally related to these interests.
 This Court believes that this also is a factual issue....
 Assuming that the factual issues [regarding the existence and nature of, and the reasons for, the policy] are settled, this Court will then decide, as a matter of law, whether the identified policy is or is not rational.
 *Dubbs II*, 769 F.Supp. at 1118.

17. It is noteworthy, too, that subsequent to the date on which the arguments in *High Tech Gays*

were submitted, an internal Defense Department study, addressing the issue of "the suitability of homosexuals for positions that require national security clearances," was made public. The study's conclusion: "the preponderance of the evidence presented in this study indicates that homosexuals show preservice suitability adjustment that is as good or better than the average heterosexual." Michael A. McDaniel, "Preservice Adjustment of Homosexual and Heterosexual Military Accessions: Implications for Security Clearance Suitability," Defense Personnel Security Research and Education Center (January 1989).

18. Defendants' implicit attempt to rely on Mr. Rubino's testimony to satisfy the rational basis standard, Defs.' Mem. at 11–12 n. 6, simply represents a misapplication of that standard. On an equal protection claim, the rational basis standard is not applied—as both parties' papers loosely suggest at times—by posing a general inquiry into the *inherent* rationality of a certain government action (*i.e.,* the revocation of a security clearance); the inquiry, rather, is whether there is a rational basis for the government *discriminating* on a certain basis in taking such action. *High Tech Gays*, 895 F.2d at 571. Therefore, the fact that there may have been a rational basis for Rubino's affirmance of the FBI's decision, which Rubino denies incorporated anti-gay discrimination, accomplishes little, if anything, here. For if plaintiff does not prove that the FBI revoked his security clearance because he is gay, then plaintiff could not succeed on his equal protection claim and there is no

### B. Serious Questions as to Rationality

Moreover, in the Ninth Circuit's most recent pronouncement regarding the review of equal protection challenges to anti-gay discrimination, the court embraced what it called "active" rational basis review even in cases where the defendant agency is, like here, one whose national security decisions are entitled to considerable judicial deference. *Pruitt v. Cheney*, 963 F.2d 1160 (9th Cir.1992). *Pruitt* cited with approval the line of Supreme Court cases which hold that the government's implementation of policies which simply give effect to society's prejudices do *not* suffice under rational basis review. The Ninth Circuit quoted *Palmore v. Sidoti*, 466 U.S. 429, 433, 104 S.Ct. 1879, 1882, 80 L.Ed.2d 421 (1984) which stated:

> The Constitution cannot control such prejudices but neither can it tolerate them. Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect.

*Pruitt*, 963 F.2d at 1165.

Especially in light of *Pruitt*, the court is of the impression that even if it were to undertake, at this juncture, an inquiry into the question of the rationality of the FBI's alleged anti-gay discrimination, by considering among other things the extent to which defendants' statements in the record regarding the FBI's policy toward gays indicate the rationality of such a policy or the lack thereof, the court would be left, at best, with serious questions as to the policy's rationality.

Among the court's questions as to the rationality of the policy is how, for example, the FBI can rationally implement a policy which (as defendants themselves describe it) requires gay employees to be simultaneously "open" and "discreet" as to their homosexual conduct. Defs.' Statement of Material Facts Not in Dispute, ¶ 13. The court also has questions as to the rationality of a policy which punishes gay employees for being less than candid about their homosexuality when it is undisputed that at least until very recently (and certainly for most of Mr. Buttino's tenure at the FBI) the FBI would clearly have purged any employee for *being* candid about one's homosexuality.

The court cannot help but wonder, moreover, whether there is anything to indicate that Buttino's lack of candor would *ever* have been an issue *but for* the FBI's history of anti-gay discrimination, and if not, whether a policy which dismisses someone for lack of candor under those circumstances has, especially under *Pruitt*, a rational basis under the equal protection clause of the Constitution.

Finally, the court has serious questions as to the rational basis for a policy which does not permit the *reinstatement* of a gay Special Agent (whose twenty-year record is unblemished *but for* a short-lived deception regarding his homosexual activities), where that employee has expressly given the FBI "unrestricted permission" to tell anybody it wants about his sexual orientation and sexual activities.

### CONCLUSION

There exists a triable issue of fact as to whether Buttino's security clearance would have been revoked and his employment terminated if he were not gay. Because the court cannot conclude from the record that such discrimination, if it occurred, was in any event rational, the court cannot say that plaintiff's claim under the equal protection clause will necessarily fail. Defendants' motion for summary judgment as to the equal protection claim is therefore DENIED. Summary judgment is also DENIED as to plaintiff's *Bivens* claim, which was not addressed in defendants' papers. Summary judgment as to plaintiff's First

---

discrimination whose rationality needs to be assessed. *See Dubbs II*, 769 F.Supp. at 1118. If, on the other hand, plaintiff establishes that he was discriminated against because he is gay in the decision to revoke his security clearance, then the court would have to inquire into the rationality of the FBI's discrimination *against gays* in its security clearance determinations. *Id.* Rubino's declaration (denying as it does that such discrimination was present) does not purport to offer reasons why such discrimination is rational.

Amendment and due process claims is HEREBY GRANTED.

IT IS SO ORDERED.

## ON MOTION FOR RECONSIDERATION

### I

### OVERVIEW

In this action, plaintiff Frank Buttino asserts that his employment as a Special Agent with the Federal Bureau of Investigation (the "FBI") was unconstitutionally terminated because he is gay. On February 11, 1992, this Court issued an Order granting defendants' motion for summary judgment as to plaintiff's claims under the First Amendment and Due Process Clause and denying summary judgment as to plaintiff's equal protection claim.[1] Defendants now move for reconsideration of the Court's denial of summary judgment as to plaintiff's equal protection claim. The crux of defendants' motion for reconsideration is that the Court improperly analyzed the Declaration of D. Jerry Rubino, the Justice Department Security Officer who affirmed the FBI's decision to revoke plaintiff's security clearance on Buttino's administrative appeal.[2] Specifically, they contend that the Court, in examining the issues presented in their summary judgment motion, should have limited its inquiry to the bases for Rubino's affirmance of the FBI's decision, and not the impropriety or alleged bias of the FBI's investigation preceding Rubino's decision. Defendants also maintain that the Court improperly attributed anti-gay bias to Rubino's decision and that evidence of discrimination against gays in the FBI in general is not germane to this Court's inquiry. The Court finds that these arguments are without merit and do not warrant reconsideration of this Court's prior decision.

### II

### DISCUSSION

A. *The Role of Rubino's Declaration in Adjudicating Defendants' Summary Judgment Motion*

Defendants begin their analysis by stating, erroneously, that the Court "held that the content of Rubino's declaration is *irrelevant*." Defs.' Mot. For Recons. at 2 (emphasis added). The Court made no such a finding. Rather, what the Court found was that his declaration did not determine, as a matter of law, that Buttino's loss of his security clearance and subsequent termination—which are inextricably intertwined—were *not* the result of the FBI's anti-gay policies. *Id.*[3]

Defendants offered Rubino's testimony as evidence of non-discriminatory bases for the revocation of plaintiff's security clearance, as Rubino was the Department of Justice Security Officer who affirmed the FBI's decision on plaintiff's administrative appeal. While such testimony potentially supports defendants' position that plaintiff was not fired because of his sexual orientation, it certainly fails to establish an absence of any triable issues of fact. The Court's finding in this regard is particularly compelling since Rubino did not even

---

1. The Court also denied summary judgment as to plaintiff's *Bivens* claim against FBI Director William Sessions, which neither party had addressed in their motion papers. The Court has since entered an Order, upon stipulation of the parties, dismissing the *Bivens* claim.

2. Because all FBI employees must have a Top Secret security clearance, plaintiff's employment was, by necessity, terminated after his security clearance was revoked.

3. The Court also found that Mr. Rubino's declaration was inadequate to demonstrate a rational basis for discrimination against gays. In this circuit, the government's discrimination against gay persons is constitutional if such discrimina-

tion is rationally related to a legitimate governmental interest. *High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 571 (9th Cir.1990). The Ninth Circuit recently clarified, however, that the test applied in *High Tech Gays* is an "active" rational basis. *Pruitt v. Cheney*, 963 F.2d 1160, 1165–66 (9th Cir.1992). This means that the government must come forward with *actual evidence* to support the rational basis; mere hypothetical reasons offered as a basis for a policy of gay discrimination are insufficient. Thus, in *Pruitt,* the Ninth Circuit reversed the district court's dismissal of a lesbian's discrimination lawsuit against the military because there was no actual evidence submitted by defendants to "rationalize" discrimination against homosexuals.

become involved in the matter until *after* the FBI had revoked plaintiff's security clearance.

At the same time, the Court found that plaintiff had submitted substantial evidence from which a reasonable trier-of-fact could infer the existence of anti-gay discrimination in the FBI, generally, and the specific effect of such discrimination on the decision to fire plaintiff. That evidence included (1) the vast disparity in the FBI's interest in plaintiff's personal life during the period when the FBI assumed he was heterosexual, as compared to the period after the FBI learned he was gay, (2) the FBI's requests that plaintiff disclose the names of other gay people at the FBI,[4] (3) documents suggesting that plaintiff's "punishment" was more severe than that typically imposed by the FBI for employee conduct of similar or greater seriousness than that for which plaintiff was accused, (4) defendants' self-described historical "absolute policy of dismissing all admitted or proven homosexuals from its employ," *see Ashton v. Civiletti*, 613 F.2d 923, 926 (D.C.Cir.1979), and (5) declarations of others testifying to anti-gay discrimination on the part of the FBI.[5]

Based on the specific evidence of gay discrimination by the FBI, the Court appropriately concluded that questions of fact remained with respect to plaintiff's equal protection claim. Nevertheless, defendants insist that this evidence does not demonstrate that Rubino's decision was tainted by anti-gay bias. Defs.' Mot. for Recons.

at 9. This argument misses the point. As discussed in the Court's previous decision, the pertinent inquiry in this action does not end with whether or not the FBI's purported anti-gay policy influenced Rubino's decision. Rather, the Court must assess whether the defendants have a policy of discriminating against homosexuals, and if so, whether that policy was rationally related to a legitimate government interest. *See* Majority Opinion at 306. Rubino's declaration does not summarily extinguish the inferences of a discriminatory motive for plaintiff's termination that reasonably could be drawn from the considerable evidence presented to the Court by plaintiff.

▆ Moreover, the cases cited by defendants in support of their motion for reconsideration support the denial of their summary judgment motion. Neither *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), *Vasconcelos v. Meese*, 907 F.2d 111 (9th Cir. 1990), nor *Palmer v. Baker*, 905 F.2d 1544, 1545 (D.C.Cir.1990) stands for the proposition, as suggested by defendants, that the assertion of the existence of non-discriminatory factors justifying the action taken by a defendant somehow bars a plaintiff from obtaining a judgment in his favor. Rather, those cases stand for the rule (in Title VII actions) that where the plaintiff establishes that an improper factor played "a motivating part" in the decision to terminate, the defendant may avoid liability only by proving by a preponderance of the evidence that it would have made the same decision even if the impermissible factor had not been taken into account. *Price*

---

**4.** It is also noteworthy that the FBI requested that Mr. Buttino disclose the names of other homosexual, but not heterosexual, agents and friends. *See* Majority Opinion at 304.

**5.** In his opposition to defendants' motion for reconsideration, plaintiff has submitted additional declarations which provide further evidence of anti-gay discrimination in the FBI. For example, M. Wesley Swearingen, a heterosexual Special Agent with the FBI for twenty-six years (whose tenure overlapped with plaintiff's tenure at the FBI for eight years) states, "unequivocally that the FBI did, during my years as a Special Agent, have a policy of discriminating against gays, or what we in the FBI often re-

ferred to as homosexual deviates, queers, fags, faggots, fruits, punks and limp wrists." Swearingen Decl. ¶ 3. In addition, Dana Tillson, who applied for a Special Agent position with the FBI in 1987, alleges that she was told shortly after her interview in December 1987 that she was the highest-rated female applicant in San Francisco and that she would be hired assuming her background investigation was satisfactory. Tillson Decl. ¶¶ 3–6. Tillson was rejected in January 1989, however, after she responded to FBI interviewers' subsequent question regarding homosexual conduct by declaring that she engages in private sexual conduct with consenting adult women. *Id.*

*Waterhouse,* 490 U.S. at 258, 109 S.Ct. at 1794; *Vasconcelos,* 907 F.2d at 113.[6]

There is nothing in any of those cases to support the proposition that the mere assertion by a defendant of alternative, non-discriminatory reasons for a termination decision *compels* a finding (at trial, much less on a summary judgment motion) that *permissible* factors were *in fact* the motivating factors for the termination decision. Here, the Court has simply found that plaintiff has provided evidence which creates a factual issue as to whether his homosexuality was the motivating factor in his termination. This is sufficient to preclude defendants' desire for summary judgment on the question of whether plaintiff was fired because he is gay.[7] The cases cited by defendants do not require—or even suggest—a different result.

### B. The Nature and Proper Scope of Plaintiff's Equal Protection Claim

It is apparent from their filings relating to the instant motion, as well as their motion for summary judgment, that defendants are intent on limiting this Court's inquiry to the FBI's "decision to revoke plaintiff's security clearance" and to Rubino's affirmance of that decision. *See* Defs.' Mot. For Recons. at 4. There are two levels to defendants' argument. First, they suggest that an examination of Buttino's security clearance decision can some- how be divorced from defendants' alleged institutional discrimination against homosexuals. And second, that Rubino's declaration somehow establishes, as a matter of law, that *the FBI's* revocation decision was not the result of discriminatory practices.

In advancing these arguments, defendants apparently seek to recast plaintiff's equal protection claim in their own terms. In doing so, they have disregarded the clear expression in the Court's prior Order that the decision to revoke plaintiff's security clearance cannot be undertaken in a vacuum, separate and apart from evidence of anti-gay discrimination within the FBI generally, and regarding plaintiff in particular. Moreover, the assertion that the Court "focused" or should focus exclusively on Rubino's handling of Buttino's administrative appeal, while completely ignoring the FBI's investigation of plaintiff, glosses over the fact that it was the FBI—not Rubino—that made the actual decision to revoke plaintiff's security clearance. Clearly, defendants are attempting to treat the security-clearance revocation decision as necessarily separate from the FBI's employment practices toward gays. Not only is this distinction artificial, but it also detracts from the central question before the Court—which is, as plaintiff has said, whether or not the FBI "got rid of" him because he is gay.[8]

---

**6.** For example, in *Vasconcelos,* the Ninth Circuit refused to remand the case to the district court for consideration of whether the defendant could establish by a preponderance of the evidence that the same employment decision would have been made if the plaintiff's gender had not been taken into account. The court reasoned that the district court had already found, following a bench trial, that gender played "absolutely no role" in her termination. *Id.*

**7.** Since defendants did not otherwise present evidence supporting a finding that actual discrimination against gays by the FBI is nevertheless rational, the Court also concluded that plaintiff's equal protection claim would not necessarily fail under the rational basis test. Defendants on this motion for reconsideration challenge only the Court's finding of the existence of an issue of fact as to whether plaintiff was fired because he is gay, not the Court's conclusion that it could not make a finding as to the rational basis for such discrimination.

**8.** The import of defendants' discussion regarding their consideration of homosexual *conduct* versus their consideration of homosexual *orientation* escapes the Court. The Ninth Circuit has held that the government's consideration of homosexual conduct in security clearance determinations may well violate the Equal Protection Clause. *See Dubbs v. CIA,* 866 F.2d 1114, 1119–1120 (9th Cir.1989) (reversing the district court's ruling that individualized consideration of homosexual conduct in security clearance determinations is necessarily constitutional and cannot be reviewed by a court for constitutional infirmity). Indeed, it seems only logical that a government agency's intense interest in an employee's homosexual conduct, and especially that agency's *disparate* interest in homosexual versus heterosexual conduct should be at least *relevant* to the factual question of whether the government agency discriminates against gay employees in general.

## C. *Unsuitability of Administrative Review to Constitutional Questions*

 The Court also rejects the notion, implicit in defendants' analysis, that the administrative affirmance of a lower agency's decision can serve to shield from judicial review arguably unconstitutional discrimination within that lower agency—no matter how extensive the evidence of that discrimination may be. Defendants have offered absolutely no authority to support such proposed immunity, and indeed, defendants' posture is inconsistent with the appropriate disposition of constitutional challenges to administrative actions.

While considerable deference is accorded to administrative determinations relating to security clearances, *Department of the Navy v. Egan*, 484 U.S. 518, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988), it is also true that "[c]onstitutional questions are unsuited to resolution in administrative hearing procedures and, therefore, *access to the courts is essential* to the decision of such questions." *Califano v. Sanders*, 430 U.S. 99, 109, 97 S.Ct. 980, 986, 51 L.Ed.2d 192 (1977) (emphasis added). Thus, even assuming benign motivations for Rubino's affirmance of the FBI's revocation of plaintiff's security clearance, Rubino is not entrusted as an arbiter of the constitutional adequacy of an administrative action.[9] As such, his decisions obviously cannot bind the judiciary to his findings even if he purported to undertake such an adjudication. This Court has the authority and the obligation under the United States Constitution to consider colorable claims under the Equal Protection Clause. Plaintiff has stated such a claim and has presented sufficient evidence creating an issue of fact as to whether the FBI fired him because he is gay.

 The propriety of according complete deference to the parent agency's administrative appellate process of a lower agency's decision is especially questionable where the parent and lower agencies each

have historically distinct operational cultures. *See generally* K. O'Reilly and J. Mayhook, *Civil Rights and the FBI*, 16 Hum.Rts. 32 (1989). In that regard, the Court finds Rubino's testimony as to *his own* or the *Department of Justice*'s tolerance of gay employees to be of limited value where plaintiff's lawsuit is challenging the allegedly pervasive discrimination against gays *in the FBI*.[10] Surely, the absence of discriminatory practices in the Justice Department outside the FBI cannot serve to shield actual unconstitutional discrimination within the FBI. In fact, there is nothing to indicate that other courts have accorded much, if any, weight to the absence of discriminatory practices in the Justice Department *generally* when reviewing discrimination claims *against the FBI*. *See, e.g., Perez v. FBI*, 707 F.Supp. 891, 903, 916–17 (W.D.Tex.1989) (Title VII class action against the FBI in which the district court placed "little confidence in the 'objectivity' " of the Equal Employment Opportunity officer's finding that the FBI did not systematically discriminate against Hispanics).

## D. *"Lack of Candor" and "Uncooperativeness" in the Wake of Employer's Own Discriminatory Practices*

Entirely aside from the foregoing, this Court also finds problematic the very argument for which Rubino's declaration is offered to support—namely, that the inference of unconstitutional discrimination is inapposite on a motion for summary judgment upon a showing that plaintiff was "deceptive" or "uncooperative." In its Order denying summary judgment as to plaintiff's equal protection claim, this Court noted that there is a viable question as to whether plaintiff's "lack of candor" and "uncooperativeness" would ever have been an issue but for the FBI's alleged anti-gay practices. Defendants' motion for reconsideration and Rubino's declaration are

---

**9.** Defendants' approach, taken to its logical conclusion, suggests that the FBI's liability for *any* illegal discriminatory conduct in its employment practices can be obviated by an administrative finding that the FBI's conduct resulted from non-discriminatory motives.

**10.** It is, after all, the FBI that revoked plaintiff's security clearance and Mr. Rubino who simply affirmed the FBI's decision on appeal.

both silent as to this salient issue. This silence is of no small consequence, as the interplay between the FBI's practices toward "admitted homosexuals" and the assertion that plaintiff's security risk was revoked because he was "less than candid" regarding his homosexuality is necessarily significant to the factual question of whether plaintiff was fired because of his sexual orientation.

It is in this respect that the handful of other reported federal cases considering equal protection claims by gay persons are of somewhat limited assistance in reviewing the constitutionality of defendants' conduct in this action. If the facts are proven to be as plaintiff alleges they are, this case would appear to be the first instance in which a federal court would have occasion to consider the constitutional sufficiency of a government agency's citing a gay employee's *lack of candor* regarding his homosexuality as the explanation for his termination. Similarly, this would be the first instance for a court to examine an accusation by an employee that he reasonably perceived *being candid* regarding his homosexuality as being a surefire ticket to dismissal.[11] By denying defendants' motion for summary judgment, and denying this motion for reconsideration, this Court is simply acknowledging that the equal protection Clause of the United States Constitution is at least implicated where a government agency allegedly turns a certain class of its own employees into security risks by its own policies, and then cites that "security risk" as the basis for the termination of a member of the affected class.

---

11. Indeed, in virtually all the other cases considering constitutional challenges to anti-gay discrimination, the defendants conceded—rather than denied, as the FBI does here—that they discriminated against gay persons. *See, e.g., High Tech Gays,* 895 F.2d at 567–79; *Pruitt,* 963 F.2d at 1160–61. In *Dubbs v. CIA,* 866 F.2d 1114 (9th Cir.1989), the CIA denied that it had a blanket policy of denying security clearances to all homosexuals. The Ninth Circuit, however, reversed the district court's grant of summary judgment in the CIA's favor on the question of whether the CIA had a blanket policy of denying security clearances to all homosexuals. *Id.* at 1119–20.

Here, the significance of this "lack of candor" allegation is particularly noteworthy because

## III

## CONCLUSION

Defendants' motion for summary judgment as to plaintiff's equal protection claim was properly denied. Defendants have failed to adduce any arguments which warrant reconsideration of that decision. Accordingly,

IT IS HEREBY ORDERED THAT defendants' motion for reconsideration is DENIED.

IT IS SO ORDERED.

the FBI is alleging that it does not believe homosexuality or homosexual conduct to be inconsistent in and of itself with the FBI's mission or that it should be grounds for the dismissal. Rather, it is concerned with how a homosexual deals with those factors, such as his candor, etc. But if the employee has good reason to believe that it is his *employer* which creates the "reason" to be less than candid about his homosexuality, then the accusation of lack of candor as the basis for his dismissal must be carefully scrutinized. That is especially so where the FBI does not even purport to argue that the plaintiff had even a remote propensity for lack of candor or uncooperativeness in *two decades* of highly commended service.